**UNITED STATES of America,
Appellee,**

v.

**John E. MANFREDONIA, Appellant.**

**No. 646, Docket 33289.**

United States Court of Appeals
Second Circuit.

Argued June 11, 1969.

Decided Aug. 5, 1969.

Joseph Aronstein, New York City, for appellant.

James T. B. Tripp, Asst. U. S. Atty., Southern Dist. of New York (Robert M. Morgenthau, U. S. Atty., and Douglas S. Liebhafsky, Asst. U. S. Atty., Southern Dist. of New York, on the brief), for appellee.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.

John E. Manfredonia appeals from a judgment of conviction on two counts of perjury in violation of 18 U.S.C. § 1621. Appellant was sentenced to eighteen months in prison and a $2,000 fine on the first count; the imposition of sentence was suspended on the second count and he was placed on probation for a period of five years to begin after the service of his sentence on count one; he was also fined an additional $2,000. The perjury charges arose out of an earlier trial of this same defendant for violations of the

Wagering Tax Act, 26 U.S.C. §§ 4401, 4411, 7203 and 7262. While the appeal from the wagering tax conviction was pending in this court, the Supreme Court decided Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 716, 19 L.Ed.2d 906 (1968), which held that these statutes were unconstitutional because they violated the Fifth Amendment privilege against self-incrimination. The appellant's conviction was thereupon reversed.

United States v. Manfredonia, 391 F.2d 229 (2 Cir. 1968).

Count One of the indictment in the present case charged that appellant's testimony in the wagering tax trial that he was not and never had been in the business of accepting wagers was false and perjurious.[1] Count Two charged that appellant perjured himself in denying various aspects of a conversation between himself and an undercover Internal Revenue Service agent who was posing as a bettor.[2]

1. The following testimony was the basis of count one:

"Q. I think this morning, Mr. Manfredonia, you testified that you weren't and you have never been in any business of accepting wagers, is that right? A. That's true.

Q. You have never taken any wagers? A. No, sir.

\* \* \* \* \*

Q. You have testified that you weren't in any business of taking wagers and you testified that you were in a business in 1958 to 1960 as the owner or operator of a restaurant; is that right? A. Operator, yes, sir; family affair.

Q. Will you tell us what your business was after 1960? \* \* \* A. I am a bettor. \* \* \*

Q. Has that been your only business since 1960? A. Yes.

\* \* \* \* \*

Q. As I understand it, your business in these last few years has been betting on horses at the track, is that right? A. Yes."

2. The following testimony was the basis of count two:

"Q. \* \* \* Did you have a conversation with Mr. Ellrodt and with the man and yourself, and if you did, please tell the Court and Jury what the conversation was.

\* \* \* \* \*

A. \* \* \* Now, Mr. Ellrodt proceeded to this car, and the agent walked with me to Mr. Sposato on the stone steps that was sitting there. And I introduced him. And he had given me a card \* \* \* And he asked—I asked him did he know Sam Kleinman, which is a two-door neighbor of mine that lived just up the street. And he said he didn't know him. And I asked him, "Did you know Mr. Powers?" He said, "Well, who is he?" I said, "He's the president of the Diamond Cutters Union, that's who he is." He said he

didn't know him. That was the end of my conversation, and I had left. That is all I had the conversation with him about.

Now, I did tell him that I wasn't responsible for any part of any transactions of any kind, of any description.

\* \* \* \* \*

Q. Did you in the presence of agent Peden on that day, August 17, 1966, say to Sposato, "What code shall we give Mr. Peterson"? A. No, I did not.

Q. Did you say anything to either Sposator or Peterson about any code to use— A. No, and positively no.

Q. —to accept bets or wagers? A. No, I did not, at no time.

\* \* \* \* \*

Q. Did you say to Agent Peterson for him to use the initials J E? A. Yes, I heard him testify to that.

Q. Did you say that to him on August 17th? A. No, I did not.

\* \* \* \* \*

Q. Did you on August 17, 1966 say to Agent Peden, "When you call up, the man at the other end will say, 'Hi there,' or 'Hello there,' and then you give him the code?" Did you say that to Agent Peden? A. No, I positively did not say that.

\* \* \* \* \*

A. \* \* \* All the conversation was about my neighbor Sam Kleinman being in the Jewelry Center and Mr. Powers, and that was it. He said he didn't know them, and that was it. Now, I don't know whether I was called, whether I had a phone call I had to make or something, but anyway that was the end of my conversation. I left the two, and I made it understood I am in no way associated or responsible. And I made that understood.

\* \* \* \* \*

Q. I want you to look carefully at Government's Exhibit 1, the slip of paper, and tell us whether during that

By its verdicts of guilty on both counts, the jury found that Manfredonia was a bookmaker who handled large bets; that on August 17, 1966 Internal Revenue Service Agent Peden, posing as a jewelry salesman and big time bettor, met the appellant through Louis Ellrodt, an intermediary, after which the appellant arranged with Peden for the placing of substantial bets. The appellant gave Peden a code for placing bets by telephone which was "JE" (Peden) for "HB" (Manfredonia), and other instructions as to making calls to place bets, including signals which the answering person would give if bets could not be placed at that time, as well as signals covering the amounts and other data on the bets made. Subsequently, Peden placed a $280 bet which he lost. Later he placed two more bets, one of which he won. As a result of these bets Peden was owed $410 by the appellant, Manfredonia, but when Peden called either to place additional bets or to collect the amount due him, he was advised that the wire room of the betting establishment had been closed down. Peden was told by one of Manfredonia's messengers or agents that he would get the money due Peden and deliver it to him at Rossi's Bar at 1:30 p. m. on August 24th, but neither the messenger nor the money was there at that time. About two hours later, however, another man outside the bar, to whom Peden had been directed, agreed to find "HB" for him. The man drove off in a white Thunderbird, and Peden with Trerotola, other special agent, followed some distance behind. They presently discovered the white Thunderbird parked in front of Manfredonia's residence. They then returned to Rossi's Bar where they met the original messenger who advised Peden that the betting business would be closed down until the following Monday, but at that time the unidentified man in the white Thunderbird returned and delivered to Peden the $410 which the stranger said he had procured at the "main office." The messenger than gave Peden a telephone number to call concerning the placement of wagers during the following week.

The first attack made by the appellant is that Agents Peden and Trerotola committed perjury and, with their testimony stricken, there is insufficient valid evidence to sustain appellant's perjury convictions. He argues that the agents' perjury is shown by the difference between Peden's grand jury testimony [3] and

conversation the few minutes you were there you saw any paper passed such as that, or that piece of paper? * * * A. No. The first time I saw that was just now. That's the first time I have seen it. * * *

Q. Did you see any piece of paper pass between Sposato and Dan, the man you knew then as Dan Peterson? A. No, I did not.

Q. Did you hear any discussion in this conversation about a deposit to be placed on the bets? A. No, I did not. * * * * *

Q. Did you hear any discussion at all in this conversation about the use of a code name? A. No, I did not. * * *

* * * * *

Q. Did you hear the words "J E for H B," or words to that effect mentioned? A. No, I did not, positively I did not.

* * * * *

Q. Will you please tell us why you brought the jewelry salesman to Mr. Sposato? A. Well, as an accommodation. This guy might know something. That's why I brought him there. Any guy looking to bet that kind of money must know something, I can learn something myself from him maybe.

3. The pertinent part of Peden's grand jury testimony was as follows:
"I went outside, and there was another individual, a third individual, who told me that Sposato would be back around four o'clock, but he could probably get my money for me, so he said he'd have to go to the main office to get the money, and he got into his car, took off, and I stood on the corner, waiting for him to return";
" * * * Well, finally after about ten minutes of standing on the corner, then Sposato showed up, and he asked me— you know he apologized for not being there at one o'clock, and he said he'd get it now. I said no, another fellow had gone up to get the money, said he was going to the main office. He said,

the testimony of both agents at the trial that when the unidentified man drove off in the white Thunderbird they followed in a Government vehicle and found the Thunderbird parked opposite Manfredonia's house.

■ Upon close examination, however, this discrepancy in the testimony is not as significant as appellant would have us believe. Peden's memorandum of activities for the day in question, made right after the events, records that he and Trerotola had followed the white Thunderbird and observed it in front of Manfredonia's residence, which verified the trial testimony. At the trial this memorandum, together with a copy of the grand jury testimony of these agents, was made available to the defense. Although he had the opportunity, defense counsel did not use any of this material to impeach Peden.[4] Finally, the portion of Peden's grand jury testimony referred to is part of a long narrative answer that was not interrupted by specific questions. In light of these facts it is obvious that, while before the grand jury, Peden simply neglected to relate the side excursion to follow the white Thunderbird and adhered to the main thread of his story.

■■ It is also clear that there was sufficient evidence to satisfy the so-called "two witness" rule that a defendant's perjury cannot be proved by the uncorroborated testimony of one witness. This requirement may be satisfied by the testimony of a second witness or by other independent evidence, circumstantial or direct. United States v. Marchisio, 344 F.2d 653, 665 (2 Cir. 1965); United States v. Collins, 272 F.2d 650, 652 (2 Cir. 1959), cert. denied, 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960). Peden's story about the excursion of the unidentified man in the Thunderbird to Manfredonia's residence and his return with the money for Peden was fully corroborated by Trerotola's testimony. There was also other supporting evidence such as Ellrodt's testimony that Manfredonia agreed to think about making arrangements to take Peden's bets and Manfredonia's subsequent call to Ellrodt to bring Peden to a specific place in Mount Vernon at a particular time.

■ Manfredonia also contends that this court's reversal of his wagering tax conviction rendered that charge "untenable" and, therefore, operated nunc pro tunc to make immaterial the testimony upon which the present perjury indictment was based. In advancing this argument appellant completely ignores the purpose of the perjury statute which is to keep the process of justice free from the contamination of false testimony. It is for the wrong done to the courts and the administration of justice that punishment is given, not for the effect that any particular testimony might have on the outcome of any given trial. For this reason it matters not what the ultimate disposition of the case may be; false swearing is still prohibited.

■ Indeed, it has long been established that an acquittal of the defendant in a trial where false testimony was given does not bar a prosecution for perjury. Adams v. United States, 287 F.2d 701, 705 (5 Cir. 1961); Kuskulis v. United States, 37 F.2d 241 (10 Cir. 1929). It has likewise been held that the reversal of a conviction because of an improper indictment will not prevent a prosecution for perjury committed at the former trial. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951). See also, United States v. Remington, 208 F.2d 567 (2 Cir. 1953), cert. denied, 347 U.S. 913, 74 S.Ct. 476,

'Oh, that must be—' I forget the name he used. We were standing there, waiting, Sposato and myself. With that, the third individual came back and handed me the money."

4. It has long been the rule in this Circuit that grand jury testimony may be used to impeach a witness. United States v. Borelli, 336 F.2d 376, 391 (2 Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); United States v. Zborowski, 271 F.2d 661, 665 (2 Cir. 1959); United States v. Spangelet, 258 F.2d 338, 341–342 (2 Cir. 1958).

98 L.Ed. 1069 (1954). In all of these cases the questioned testimony was material at the time it was given, and subsequent events did not eliminate that materiality.[5] To sustain a conviction of perjury, "* * * materiality must be established only as of the time [the] answers were given." United States v. McFarland, 371 F.2d 701, 703 (2 Cir. 1966).

 Finally, appellant urges that the testimony of Ellrodt and Peden concerning their discussions prior to the contact with Manfredonia is hearsay, and that the introduction of this testimony was prejudicial error. But these conversations were plainly relevant to show the events leading up to the introduction of Peden to Manfredonia. They were only offered for the purpose of showing that Peden and Manfredonia met and conversed and not for the truth of what they said to each other. Moreover, the trial court made this clear in its charge when it instructed the jury that such conversations might not be taken as evidence that Manfredonia was at any time engaged in bookmaking. Also it should be noted that both Ellrodt and Peden testified in court and were available for cross-examination. See United States v. Elgisser, 334 F.2d 103, 108 (2 Cir.), *cert. denied,* 379 U.S. 881, 85 S.Ct. 151, 13 L. Ed.2d 87 (1964). Cf. United States v.

Catino, 403 F.2d 491, 496 (2 Cir. 1968); United States v. Brill, 350 F.2d 171, 173 (2 Cir. 1965).

The judgments of conviction are affirmed.

---

5. The fact that Manfredonia's conviction on the wagering tax charge was overturned because of the unconstitutionality of the wagering tax statutes, rather than because of a defective indictment or other error, makes no difference whatever in the matter of the materiality of the false testimony or the validity of the perjury charge.

Analogous to the present situation are those cases where prosecutions for false swearing or reporting of false information have been permitted despite the fact that the statutory provisions which required the reporting of the information may have been unconstitutional (Dennis v. United States, 384 U.S. 855, 865–866, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Kay v. United States, 303 U.S. 1, 6–7, 58 S.Ct. 468, 82 L.Ed. 607 (1938); United States v. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82

L.Ed. 205 (1937)); or that the governmental agency involved had been improperly delegated the authority to make the inquiry (Ogden v. United States, 303 F. 2d 724, 731 (9 Cir. 1962)); or that the administrative body involved was not a validly constituted tribunal (United States v. Meyer, 140 F.2d 652, 655 (2 Cir. 1944)). In all of these cases the constitutionality of the statute pursuant to which the answers were given was held to be irrelevant to the question of whether the defendant's answers were material to the particular proceeding. This was so because the perjury or false reporting prosecution was one to punish the defendant for false swearing or for fraud on the government, not one to enforce the invalid statute or regulation pursuant to which the answers were given.