**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William T. ELLIS, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellant,**

v.

**William T. ELLIS, Defendant–Appellee.**

Nos. 90–5726, 91–5771.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 3, 1991.

Decided: Dec. 12, 1991.

As Amended Jan. 7, 1992.

Franklin Dorrah Cleckley, Morgantown, W.Va., argued (Phillip D. Gaujot, Charleston, W.Va., on the brief), for defendant-appellant.

Joseph F. Savage, Jr., Asst. U.S. Atty., Huntington, W.Va., argued (Michael W. Carey, U.S. Atty., Huntington, W.Va., on the brief), for plaintiff-appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and PHILLIPS and NIEMEYER, Circuit Judges.

## OPINION

POWELL, Associate Justice:

The principal questions presented in this appeal are whether the district court erred in admitting hearsay statements of a deceased witness, in allowing discovery of the Appellant's personal notes, and in calculating the Appellant's sentence. For reasons that follow, we affirm the Appellant's conviction and his sentence.

### I

Appellant William Ellis was a 20% limited partner of Tri–State Greyhound Park, Inc. (Tri–State), a West Virginia corporation that operates pari-mutuel betting on greyhound races. Under West Virginia law, facilities like Tri–State are allowed to keep a specific percentage—the "takeout"—of the revenue generated by public wagers. In 1986 the owners of Tri–State, faced with unanticipated shortfalls in revenue, supported a proposed bill that would have increased their "takeout" percentage. The 1986 "takeout" bill received the support of both houses of West Virginia's bicameral legislature, but was subsequently vetoed by the Governor.

In 1987, a similar bill was introduced and renewed efforts were made to obtain support for it. To this end, Tri–State promised to pay Ellis $500,000 if the bill became law. Ellis proceeded in a variety of allegedly fraudulent ways to assure passage of the bill. He worked primarily through Samuel D'Annunzio, a seasoned West Virginia lobbyist, providing him with sums of cash, among other things, with which to influence various state legislators.

The West Virginia legislature eventually passed, and the Governor signed, the 1987 bill. Soon afterwards, a federal investigation into charges of corruption surrounding passage of the 1987 bill was initiated. As a consequence of that investigation, D'Annunzio entered into a plea agreement with the federal government. D'Annunzio met several times with federal agents, elaborating the methods used to further the scheme and detailing the nature of his relationship with Ellis. D'Annunzio also secretly recorded conversations with Ellis and other participants in the scheme. On December 4, 1988, in the midst of the investigation, D'Annunzio committed suicide.

On the basis of information provided by D'Annunzio and others, Ellis was indicted. The superseding indictment charged eight counts of Hobbs Act, mail fraud, racketeering, and obstruction of justice violations. A jury convicted Ellis on all of the counts except two—the mail fraud charge and a substantive extortion charge. The district court sentenced Ellis to 107 months and fined him $50,000.

### II

### A

■ Ellis first argues that the district court violated his rights under the Confrontation Clause by admitting hearsay statements of deceased witness Samuel D'Annunzio that did not bear sufficient "indicia of reliability." Ordinarily we review the admission of hearsay statements for abuse of discretion. *United States v. Hinkson*, 632 F.2d 382, 385 (4th Cir.1980). In this case, however, de novo review is appropriate. For shortly after the jury returned its verdict, the Supreme Court issued a decision that bears on this question. In *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Court held that, for purposes of the Confrontation Clause, the presence of corroborating evidence may not be considered in determining the reliability of hearsay testimony. Because the district court relied on corroborating evidence in admitting D'Annunzio's statements, we must determine whether the statements otherwise were properly admissible.

■ A two-part test determines whether "incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause." *Id.* 110 S.Ct. at 3146 (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980)). The prosecution first must show that the declarant was unavailable. *Id.* Then it must demonstrate that the statements have the neces-

sary "indicia of reliability." *Id.* This latter requirement is met, *Idaho* instructs, in one of two ways: either by showing that the statements "fall[ ] within a firmly rooted hearsay exception" or by showing that the statements bear sufficient guarantees of trustworthiness. *Id.*

■ Applying this standard, we think that D'Annunzio's statements were properly admitted. The circumstances in which D'Annunzio made the statements provided strong "indicia of reliability." [1] First, D'Annunzio issued the statements voluntarily in the presence of two government agents *and* both of his attorneys. Second, D'Annunzio made the statements in accordance with a plea agreement which required him to be truthful with federal investigators. Third, the government agents were taking notes in the presence of D'Annunzio as the statements were made. Fourth, D'Annunzio could be deemed to know, in view of the plea agreement, that what he was saying would be the subject of further investigation—and confirmation—by the government. Fifth, though the plea agreement did not require him to do so, D'Annunzio agreed to record subsequent conversations with the individuals he had implicated (Senators Tucker and Ellis), suggesting that he was willing to have the truthfulness of these statements tested.

This Court's decision in *United States v. Workman,* 860 F.2d 140 (4th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989), is persuasive—though perhaps not controlling—authority that D'Annunzio's statements should have been admitted. *Workman* also involved the statements of a deceased witness that were obtained in the course of a plea agreement. And this Court approved the admission of those statements under quite similar circumstances. The only relevant difference between the indicia of reliability in *Workman* and in this case is that *Workman* contained one additional measure of reliability—a tape recording of the declarant's statements. *See Workman,* 860 F.2d at 142–46.

This distinction, however, does not compel a different outcome in this case. Other factors—particularly the presence of D'Annunzio's two attorneys—strongly suggest that the statements were trustworthy. Moreover, the principal danger of the absence of a tape recording—the accuracy of the hearsay statements—was not challenged seriously in this case. Charles Little, an agent with the Internal Revenue Service, testified to his recollection of D'Annunzio's statements on the basis of notes he had taken at the meetings with D'Annunzio. Three other witnesses attended those meetings, two of whom (D'Annunzio's attorneys) had interests adverse to those of the government. Ellis chose not to call any of these participants to challenge Agent Little's recollection of D'Annunzio's statements. We therefore assume that the accuracy of the statements was not questioned.

Ellis also contends that the Supreme Court's decision in *Idaho* overrules an aspect of the *Workman* analysis upon which the district court relied. He specifically attacks *Workman's* statement that a declarant's willingness to record conversations with conspirators bears on the truthfulness of the declarant's earlier statements. Language in *Idaho,*[2] Ellis claims, indicates that this factor no longer is relevant to the reliability inquiry because this particular circumstance did not exist at the time D'Annunzio made the statements. We do not think, however, that *Idaho* placed a time bar on the circumstances that may be used to demonstrate the reliability of hearsay statements. Such a reading of the case would extend the decision well beyond the question presented (is corroborating evidence an indicia of reliability?); would conflict with other portions of the opinion, *see,* e.g., *Idaho,* 110 S.Ct. at 3148 ("we decline to read into the Confrontation

---

1. Rule 804(b)(5), a residual provision, is not a traditional hearsay exception. *Cf. Idaho,* 110 S.Ct. at 3147.

2. Ellis relies on the following language: "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho,* 110 S.Ct. at 3148.

Clause a preconceived and artificial litmus test") and *id.* at 3150 ("courts have considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the [Confrontation] Clause."); and would remove from consideration a factor that logically bears on the central issue under the Confrontation Clause—whether the statements are trustworthy. In our view *Idaho* neither directly nor by implication overruled this aspect of the *Workman* analysis.

In sum, the statements had sufficient indicia of reliability to meet the requirements of the Confrontation Clause. And given the circumstances in which the statements were made, cross-examination would have had only "marginal" value in this case. *Id.* at 3149.

**B**

 Ellis further argues that the district court erred in allowing the government to discover two of his appointment books and certain personal notes (collectively, "appointment books"). We disagree. A Defendant who testifies waives his Fifth Amendment privilege in all areas subject to proper cross-examination. *Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958). Proper cross-examination—and therefore waiver—reaches all subject matters relevant to the direct examination. *See Johnson v. United States*, 318 U.S. 189, 195, 63 S.Ct. 549, 552, 87 L.Ed. 704 (1943) ("waiver as to all other relevant facts") (citation omitted); Fed.R.Evid. 611(b). In this instance Ellis took the stand and testified about the dates, places, and subject matter of various meetings involved in the alleged bribery scheme. This testimony related directly to entries in his appointment books. Ellis also admitted that he consulted the appointment books to refresh his memory both before and after meeting with federal agents. The pertinence of the information in the appointment books to his direct testimony, together with his reliance on them to refresh his memory, fully supported the district court's decision.[3] *See United States v. Black*, 767 F.2d 1334, 1341 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985).

**III**

Ellis next argues that the district court improperly enhanced his sentence under § 3B1.1(a) and § 2C1.1(b)(2)(A) of the United States Sentencing Commission, *Guidelines Manual* (Guidelines). We review both challenges, the parties agree, for clear error. *See United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 82 (1990).

 Section 3B1.1(a) prescribes a four-level increase in offense level "[i]f the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Relying on the fact that D'Annunzio, not Ellis, knew the senators necessary to obtain passage of the legislation, Ellis claims that he did not exercise the requisite degree of control over the scheme to merit an enhancement. This argument is unpersuasive. Even if Ellis did rely on D'Annunzio's contacts, and even if D'Annunzio's contacts were essential to the scheme, these factors do not necessarily show that Ellis was merely a peripheral member of the bribery scheme. Other evidence firmly

---

**3.** Ellis also argues that Rules 16, 17, and 26.2 of the Federal Rules of Criminal Procedure barred discovery of the appointment books. The argument suggests—though it does not explicitly state—that these rules extend a Defendant's protection from discovery further than the Fifth Amendment. Because this novel contention lacks any foundation in either the language of the rules *see,* e.g., Rule 16(b)(1) and (b)(2), Rule 17(c) and (h), Rule 26.2(a) and (f), or the case law, *see,* e.g., *United States v. Nobles*, 422 U.S. 225, 235, 95 S.Ct. 2160, 2168, 45 L.Ed.2d 141 (1975) ("Both the language and history of Rule 16 indicate that it addresses only pretrial discovery.... This hardly suggests any intention that the Rule would limit the court's power to order production once trial has begun."), we reject it.

supported the conclusion that Ellis orchestrated the scheme.[4]

■ The evidence also supports the court's finding that the criminal activity was "extensive." The scheme involved four major participants—Ellis, D'Annunzio, and Senators Tucker and Tonkovich—as well as other lobbyists, legislators and their staffs. In considering whether an activity is "otherwise extensive," a court may consider, as it did here, "all persons involved during the course of the entire offense," even the "unknowing services of many outsiders." § 3B1.1, comment. (n. 2).

■ Ellis challenges all four components of the district court's sentencing determination under § 2C1.1(b)(2)(A).[5] We need consider only two aspects of that calculation, however, as they place the benefit to be received above the $800,000 minimum necessary for an eleven-level enhancement. Contrary to Ellis' contention, the district court properly included in this calculation the $500,000 payment that Tri–State promised Ellis if the bill was passed. Although Tri–State later reneged on this commitment (apparently after the bill became law), Ellis testified, and other taped conversations revealed, that he expected to receive the payment if his "lobbying" efforts were successful. The evidence also supports the court's determination that Ellis' 20% interest in Tri–State, amounting to $602,109, was a benefit received from passage of the "takeout" bill. Again, Ellis' own testimony supported the calculation. Passage of the legislation, Ellis testified, was essential to maintaining Tri–State as an operating business entity. Further supporting each of these findings is Ellis' admission at trial that he anticipated "mak[ing] millions off of" the bill.

■ In its cross-appeal, the government makes several arguments to the effect that the court *under*-calculated the § 2C1.1 enhancement for benefit received. The district court, the government claims, took an overly restrictive view of the guideline by focusing on personal benefit to the *Defendant* from the bribery scheme. Instead, the government asserts, the court should have considered the total profit (over 11 million dollars) to the two race tracks—Tri–State and Wheeling Downs—from the scheme.

The government claims that this approach is sanctioned by language from *other* provisions of the Guidelines that focuses on the total loss or harm caused by the offense. These provisions, however, show only that the drafters of the Guidelines knew how to prescribe punishment on this basis, not that they intended to in drafting § 2C1.1. Equally unavailing is the government's reliance on the principle that a conspirator must answer for his conduct *and* for all foreseeable consequences of it. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Neither the provision itself nor precedent requires that vicarious liability apply to § 2C1.1 calculations.

Finally, the government claims that a recent Fourth Circuit case adopts the government's theory. In *United States v. Muldoon,* 931 F.2d 282, 289 (4th Cir.1991), the Court suggested in a one-paragraph discussion that a sentencing court might look at bribe-generated benefits from a corporate perspective (i.e., net profit), not just the perspective of the individual responsible for making the bribe. *Muldoon,* however, is not controlling. First, the discussion is *dictum.* In making its calculation

---

**4.** The evidence showed that Ellis supplied the money for the conspiracy and authorized expenditures to further it; he recruited members of the conspiracy, i.e., D'Annunzio; and he stood substantially to benefit from passage of the "takeout" bill. Each of these factors tends to show a leadership or organizational role in the crime. *See* § 3B1.1, comment. (n. 3). Cumulatively they support the factual finding on this point.

**5.** Section 2C1.1(b)(2)(A) increases a Defendant's offense level "[i]f the value of the bribe or the benefit received, *or to be received,* in return for the bribe exceeded $2000". (Emphasis added.) The extent of that increase is determined under § 2F1.1(b)(1). This latter provision authorizes the sentencing judge to increase the offense level from one to eighteen levels depending on the anticipated benefit from the crime. In this case the court found *that Ellis anticipated mak*ing $1,231,636.87, which merited an eleven-level increase.

the *Muldoon* Court ultimately relied on the amount of the bribes transmitted by the Defendant, not the benefit derived by the corporation from the bribes. Second, *Muldoon* involved discrete government contracts, for which there is a reliable measure of the total benefit received—net profit on the illegally obtained contract. In contrast, calculating the total benefit received by companies who profit from improperly passed legislation is a far less certain endeavor, one that (as this case suggests) is potentially limitless in reach.

We have reviewed the parties' other contentions and also find them to be without merit. Accordingly, the judgment is

AFFIRMED.