PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

RAJUL RUHBAYAN, a/k/a Creme, a/k/a
Kreem, a/k/a Day-Ja, a/k/a Deja,
a/k/a Amir Ruhbayan, a/k/a Jibra'el
Ruh-alamin, a/k/a Jibrael
Ruhalamin, a/k/a James Vernon
Wood, a/k/a James Vernette
Johnson,

             *Defendant-Appellant.*

No. 04-4103

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(CR-02-29)

Argued: February 4, 2005

Decided: April 21, 2005

Before WILKINS, Chief Judge, and KING and
DUNCAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Chief Judge Wilkins and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** Joseph Barry McCracken, Norfolk, Virginia, for Appellant. James Ashford Metcalfe, Assistant United States Attorney,

OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Alexandria, Virginia; Karen Lynn Peaden, Third-Year Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

## OPINION

KING, Circuit Judge:

Rajul Ruhbayan appeals his multiple convictions and sentences in the Eastern District of Virginia for offenses arising from an obstruction of justice scheme in his earlier federal criminal trial. He makes several contentions on appeal, most notably that the district court erred in admitting evidence barred by attorney-client and work product privileges and the rules of evidence; in ruling that his conspiracy conviction was not defective under Wharton's Rule; and in enhancing his sentences on the basis of judge-found facts under the Sentencing Guidelines. As explained below, we reject each of Ruhbayan's challenges to his convictions. We vacate his sentences, however, and remand for resentencing pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), and its progeny.

I.

The factual scenario underlying the convictions and sentences on appeal relates to Ruhbayan's scheme to have his former girlfriend, Yolanda Goodman, testify falsely during his September 2000 trial in the Eastern District of Virginia on drug trafficking and firearms charges (the "First Trial"). Following the First Trial, Goodman cooperated with the Government and provided evidence against Ruhbayan. As a result, Ruhbayan was indicted in February 2002 for five additional offenses arising from his obstruction of justice scheme. This indictment resulted in Ruhbayan's "Second Trial," and the convictions and sentences from which this appeal ensues.

A.

On August 25, 2000, Ruhbayan was indicted for multiple felonies, including being a felon in possession of a firearm, in contravention

of 18 U.S.C. § 922(g)(1), and related criminal offenses. During his First Trial, the prosecution presented several witnesses to Ruhbayan's drug trafficking and firearms activities, including Martinsville and Suffolk, Virginia, police officers. For example, officers testified that, incident to Ruhbayan's arrest on April 14, 2000, they recovered a loaded nine-millimeter pistol, which had been hidden between cushions in the back seat of Ruhbayan's van.

In response to the Government's evidence, Ruhbayan presented the testimony of three witnesses, including himself and Goodman. In his defense, Ruhbayan admitted that he was a convicted felon, but denied that he was a drug dealer and had ever possessed or used firearms, including the pistol recovered from his van. Goodman testified on Ruhbayan's behalf that she was his girlfriend, that she had often been to his home, and that she had never seen him with either drugs or firearms. Importantly, she admitted that she was a convicted felon and had placed the pistol in the van without Ruhbayan's knowledge. Thereafter, the jury in the First Trial convicted Ruhbayan on two lesser-included misdemeanor offenses — simple possession and conspiracy to possess crack cocaine — but acquitted him on the other counts, including the § 922(g)(1) firearm possession charge. After being sentenced to twenty-four months in prison, Ruhbayan appealed, and we affirmed. *See United States v. Ruhbayan*, No. 01-4009, 2001 WL 867446 (4th Cir. Aug. 1, 2001) (unpublished).

B.

1.

On February 2, 2001, Goodman was indicted by the grand jury, apparently as the result of her testimony in the First Trial. She was charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), having admitted under oath that she was a convicted felon and that she had possessed the pistol found in Ruhbayan's van. Goodman then changed her story, advising the Government that she had testified falsely in the First Trial regarding Ruhbayan's drug trafficking and firearms activities. On May 9, 2001, she entered a plea of guilty to an information charging her with obstruction of justice, in violation of 18 U.S.C. § 1503. In her plea agreement, Goodman stipulated that she had:

> testified falsely [in the First Trial] that she had possessed the firearm and ammunition and that she had placed them in Ruhbayan's vehicle without his knowledge on or about April 14, 2000, in Suffolk, Virginia, when she knew in fact that she had never possessed the firearm and ammunition, had never placed them in Ruhbayan's vehicle, and was testifying falsely as requested by . . . Ruhbayan in order to assist him in misleading the jury . . . .

Goodman also agreed to testify against Ruhbayan in any subsequent trials, and she provided the Government with more than fifty letters he had written to her while awaiting his First Trial. In the letters, Ruhbayan first directed Goodman to find a non-felon to testify falsely for him by admitting possession of the pistol, and he eventually convinced Goodman to lie on his behalf about placing the pistol in his van.

On February 12, 2002, the grand jury returned a five-count indictment against Ruhbayan for the events relating to Goodman and the First Trial, charging him with (1) conspiracy to commit perjury and obstruct justice, in contravention of 18 U.S.C. § 371; (2) corruptly influencing and attempting to influence the testimony of a witness, in violation of 18 U.S.C. § 1512(b)(1); (3) perjury, in contravention of 18 U.S.C. § 1623; (4) subornation of perjury, in violation of 18 U.S.C. § 1622; and (5) obstruction of justice, in contravention of 18 U.S.C. § 1503. On April 10, 2002, the district court denied Ruhbayan's motion to dismiss on the basis of collateral estoppel, premised on his claim that the verdict in the First Trial barred the charges in the new indictment. Ruhbayan then appealed the denial of his collateral estoppel claim to this Court, asserting jurisdiction under the collateral order doctrine. We affirmed by published opinion, *United States v. Ruhbayan*, 325 F.3d 197, 205 (4th Cir. 2003), holding that collateral estoppel did not bar the prosecution of Ruhbayan on the perjury and subornation of perjury charges, notwithstanding his acquittal on certain of the drug trafficking and firearms-related charges in the First Trial.[1] The district court subsequently denied sev-

---

[1]At oral argument in the collateral order appeal, Ruhbayan abandoned his collateral estoppel challenge on the other three counts of the new indictment — conspiracy to commit perjury and obstruct justice, corruptly influencing and attempting to influence the testimony of a witness, and obstruction of justice. *See Ruhbayan*, 325 F.3d at 201 n.1.

eral of Ruhbayan's other pre-trial motions, including motions to quash the prosecution's subpoena of James Melton (Ruhbayan's lawyer in the First Trial), and any documents from Melton's files concerning his representation of Ruhbayan, on the basis of the attorney-client and work product privileges; to bar the introduction of evidence concerning Ruhbayan's history of drug trafficking and firearms activities; and to dismiss the conspiracy count on the basis of Wharton's Rule.

2.

In Ruhbayan's Second Trial, the prosecution introduced the testimony of seven witnesses. As the district court observed, however, the prosecution's most important evidence was Goodman's testimony and the letters Ruhbayan had written to her prior to his First Trial. *See United States v. Ruhbayan*, No. 2:02cr29, slip op. at *4 (E.D. Va. Feb. 3, 2004).[2] Goodman testified in the Second Trial that her testimony

---

[2]Approximately thirteen of Ruhbayan's letters to Goodman were admitted into evidence at the Second Trial. Those letters, which Ruhbayan admitted writing, included the following inculpatory statements:

> once the right person is found to claim the gun then the lawer can really guide us. It's that simple.

> We need to find a person for the gun, Think *who* would or could be possibilities, find out who doesn't have felonies. Its that simple . . . .

> I need a non-felon. I need it now. There are thousands upon thousands of people in Suffolk without felons.

> Baby all I really have aginst me is a gun. Once you claim the gun; then we go to court. On the court date; they will drop the charges against me. & may may not pick them up on you.

> Tell my lawyer that you are calling for Rajul Ruhbayan. That you would like to confess to the gun found in my van stuffed between the rear seat back cushions. That the gun is all black & that it did have some bullets in it.

> As for the gun. Since I had no knowledge of it being in the van or you having it you are basically free to say what you want on how you got it.

in the First Trial had been false, that she had never possessed the pistol recovered from Ruhbayan's van, that she had observed Ruhbayan with firearms on several occasions, and that he had been engaged in substantial drug trafficking activities. She also testified to Ruhbayan's mental and physical abuse, *e.g.*, that Ruhbayan prohibited her from answering the door of their residence, required her to wear Muslim headdress and garb, pushed her off the porch, and beat and choked her. In addition, lawyer Melton testified that Ruhbayan had inquired before trial into possible sentences, under federal and state law, for possession of a firearm as a convicted felon, and that Goodman had contacted Melton about testifying for Ruhbayan in the First Trial, asserting that the pistol found in his van belonged to her.[3] Several police officers from Martinsville and Suffolk also testified to Ruhbayan's possession of cash and cocaine, their discovery of the pistol in the van, and their subsequent execution of a search warrant for his home and the recovery of multiple firearms, drug residue, and drug paraphernalia.[4]

Ruhbayan testified in his own defense in his Second Trial, maintaining, as he did in the First Trial, that the pistol found in the van was not his. He asserted that, by his letters to Goodman, he only sought to have her testify truthfully and that much of his language was an

---

    Me doing 5 to 8 years doesn't help. You doing 18 months shows your real.

The letters laid out a blueprint for Goodman to follow upon being convinced to testify that she placed the pistol in the van, including instructions on who to contact and what to say. Ruhbayan also told Goodman that other witnesses should be contacted to testify to his "none association" with guns or "coke."

[3]The prosecution introduced three redacted letters from Melton to Ruhbayan, evidencing Melton's response to Ruhbayan's request for information on sentencing and advising that Goodman claimed responsibility for the pistol found in Ruhbayan's van.

[4]In the Second Trial, the prosecution also called Lanetta Riddick, a former girlfriend of Ruhbayan, as a witness. Riddick testified that she had seen Ruhbayan with various firearms and drugs over the course of their relationship. She was also permitted to describe Ruhbayan's abusive behavior towards her.

attempt at rap lyrics. On October 24, 2003, the Second Trial jury returned a guilty verdict on all five counts. Ruhbayan then sought judgment of acquittal and a new trial, which the district court denied on February 3, 2004. *See United States v. Ruhbayan*, No. 2:02cr29 (E.D. Va.).

3.

On February 4, 2004, the court conducted Ruhbayan's sentencing hearing. In determining Ruhbayan's sentencing range, the court enhanced his offense level by four levels for his leadership role in an "otherwise extensive" crime under § 3B1.1(a) of the Sentencing Guidelines, finding, *inter alia*, that the criminal activity included Ruhbayan, Goodman, Melton, Melton's staff, and the twelve jurors in the First Trial. *See United States v. Ruhbayan*, 302 F. Supp. 2d 634, 636 (E.D. Va. 2004). In making its § 3B1.1(a) ruling, the court concluded that "many other individuals who are not criminally responsible for the offense unwittingly assisted in its execution," and, under our decision in *United States v. Ellis*, 951 F.2d 580 (4th Cir. 1991) (Powell, J.), the use of the "unknowing services of many outsiders" warranted the application of the enhancement. *Ruhbayan*, 302 F. Supp. 2d at 636.

Ruhbayan's Presentence Report (the "PSR") recommended a total Offense Level of 34 and a Criminal History Category of III, resulting in an applicable sentencing range of 188-235 months. Both Ruhbayan and the Government filed objections to the PSR: Ruhbayan contended, *inter alia*, that he should not receive a two-level enhancement under § 3B1.1(c) for a leadership role in the criminal activity, while the Government contended, *inter alia*, that Ruhbayan's conduct warranted a four-level enhancement under § 3B1.1(a). At sentencing, the court enhanced Ruhbayan's Offense Level by four levels under § 3B1.1(a), resulting in a total Offense Level of 36. It also adjusted his Criminal History Category from III to VI pursuant to § 4A1.3(a), finding that Category III substantially underrepresented his criminal history. Finally, the court found that the Guidelines did not adequately consider Ruhbayan's responsibility for the underlying offenses, and it departed upward from the applicable sentencing range for Criminal History Category VI and Offense Level 36 (324-405 months) pursuant to § 5K2.0. As a result, the court sentenced Ruhbayan to life in

prison on the witness tampering count and to sixty months on each of the remaining counts, all to run concurrently.[5]

Ruhbayan has filed a timely notice of appeal, and we possess jurisdiction under the provisions of 28 U.S.C. § 1291. We assess his contentions of error in turn.[6]

## II.

On appeal, Ruhbayan raises multiple contentions of error as to his convictions and sentences. First, he maintains that the trial court erred in admitting the testimony and work product of his former lawyer, and in its admission against him of prior bad acts evidence.[7] He next contends that the court erred in failing to dismiss the conspiracy charge under the doctrine known as Wharton's Rule, as explained by the Supreme Court in *Iannelli v. United States*, 420 U.S. 770 (1975) (discussing history and application of Rule). In challenging his sentences, Ruhbayan maintains that they should be vacated pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005). Alternatively, he asserts multiple sentencing errors, most significantly challenging the court's application to him of the leadership role enhancement under § 3B1.1(a) of the Sentencing Guidelines.

---

[5]At the sentencing hearing, the trial court vacated Ruhbayan's conviction on the obstruction of justice count, concluding that it was multiplicitous with the witness tampering count. He was therefore sentenced on a total of four convictions.

[6]On August 20, 2004, following the Supreme Court's June 2004 decision in *Blakely v. Washington*, 124 S. Ct. 2531, Ruhbayan directed this Court's attention to *Blakely*'s potential implications in this appeal. Supp. Br. of Appellant at 4 ("The sentence imposed by the district court pursuant to the U.S. Sentencing Guidelines violated [Ruhbayan's] Sixth Amendment right to trial by jury.").

[7]Ruhbayan also contends that the district court erred in admitting evidence precluded by the doctrine of collateral estoppel. We addressed his collateral estoppel issues in Ruhbayan's most recent appeal, and this claim warrants no further discussion. *See generally United States v. Ruhbayan*, 325 F.3d 197 (4th Cir. 2003) (addressing Ruhbayan's collateral estoppel contentions regarding Second Trial).

A.

1.

In challenging the evidence admitted against him in the Second Trial, Ruhbayan makes, *inter alia*, two separate contentions. First, he contends that the court erred in concluding that the testimony of his former lawyer and the admission of letters written by Melton to Ruhbayan, *see supra* note 3, fell within the crime-fraud exception to the attorney-client and work product privileges. *See United States v. Ruhbayan*, 201 F. Supp. 2d 682 (E.D. Va. 2002); *see also United States v. Ruhbayan* No. 2:02cr29, slip op. at *14-15 (E.D. Va. Feb. 3, 2004). In assessing such a contention, we review a trial court's factual findings for clear error, and we review its application of the legal principles de novo. *In re Grand Jury Subpoena*, 341 F.3d 331, 334 (4th Cir. 2003). However, we will not, "absent a clear showing of abuse of discretion," vacate the trial counsel's determination that the prosecution made a prima facie showing of the defendant's crime or fraud. *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (1989). In light of the evidence on the crime-fraud point, particularly Ruhbayan's letters to Goodman and her testimony about contacting his lawyer, the court's finding that Ruhbayan had used his attorney to dupe the court and jury at the First Trial was not clearly erroneous. As a result, the court did not err in authorizing the prosecution to present Melton's testimony and three of his letters to Ruhbayan in the Second Trial.

Second, Ruhbayan maintains that the trial court also erred in permitting the prosecution to introduce evidence of his prior bad acts, including allegations of physical abuse against his former girlfriends. *See United States v. Ruhbayan* No. 2:02cr29, slip op. at *13, 15-16 (E.D. Va. Feb. 3, 2004). We review such evidentiary rulings for abuse of discretion. *See United States v. Godwin*, 272 F.3d 659, 670 (4th Cir. 2001). In so doing with respect to these contentions, we perceive no error in the court's admission of evidence relating to Ruhbayan's prior drug trafficking and firearms activities, which were relevant to show that Ruhbayan and Goodman had falsely testified at the First Trial. The evidence of Ruhbayan's physical abuse of women was deemed relevant by the trial court to Goodman's motive for being willing to testify falsely at the First Trial, and the court properly instructed the jury on the limited purpose for which such evidence

could be considered.[8] As a result, Ruhbayan's contentions of evidentiary error at the Second Trial must also be rejected.

2.

Ruhbayan next contends that the conspiracy charge lodged against him should have been dismissed, and that his conspiracy conviction should be vacated, because that charge is barred by Wharton's Rule. We review this contention de novo. *See United States v. Castro*, 887 F.2d 988, 996 (9th Cir. 1989). Generally, a conspiracy to commit an offense and the actual commission of the offense constituting the object of the conspiracy do not merge into a single punishable act, and a defendant — or multiple defendants — can be prosecuted both for the conspiracy and for the substantive offense which was the conspiracy's object. *United States v. Walker*, 796 F.2d 43, 46 (4th Cir. 1986). By Wharton's Rule, however, the courts have created a judicial exception to this proposition. *Id.* Under that Rule, "'[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.'" *Iannelli v. United States*, 420 U.S. 770, 774 n.5 (1975) (quoting 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 89, p. 191 (1957)). Thus, a person cannot, under Wharton's Rule, be prosecuted for conspiracy to commit such offenses as adultery, incest, bigamy, or dueling — the classic Wharton's Rule offenses — "since the substantive offense necessarily requires concerted criminal activity." *Walker*, 796 F.2d at 46 (citing *Iannelli*, 420 U.S. at 782).

Ruhbayan contends that his convictions for witness tampering and subornation of perjury required the participation of at least two persons, thus precluding an additional conviction for conspiracy. Specifically, he asserts that the conduct punished by the subornation of perjury and witness tampering charges, and the conduct sought to be

---

[8]Ruhbayan also contends that the court erred in admitting evidence regarding the nature of an earlier conviction for involuntary manslaughter, because he had offered to stipulate to being a convicted felon. However, the only evidence of his prior felony was a single reference to his "previous violent felony" in Ruhbayan's letters to Goodman, to which he failed to object.

reached by the conspiracy charge, was sufficiently congruent to be barred by Wharton's Rule.

As the district court ruled in denying judgment of acquittal on Ruhbayan's conspiracy conviction, however, Wharton's Rule is inapplicable in the circumstances of this case. *See United States v. Ruhbayan*, No. 2:02cr29, slip op. at *8-9 (E.D. Va. Feb. 3, 2004). In *Iannelli*, the Court observed that Wharton's Rule is aimed at activities where "the immediate consequences of the crime rest on the parties themselves rather than on society at large." 420 U.S. at 782-83. Here, as the trial court aptly observed, the immediate consequences of Ruhbayan's witness tampering and subornation of perjury crimes fell on society at large and on the criminal justice system itself, rather than on Ruhbayan and Goodman only. *See Ruhbayan*, No. 2:02cr29, slip op. at *9; *see also, e.g.*, *United States v. Markiewicz*, 978 F.2d 786, 802 (2d Cir. 1992) (observing that purpose of federal statute barring perjury is to punish wrong to judicial system); *United States v. Manfredonia*, 414 F.2d 760, 764 (2d Cir. 1969) (observing that perjury statute protects judicial system itself). In these circumstances, Ruhbayan's conspiracy conviction is not barred by Wharton's Rule.

## B.

Turning next to Ruhbayan's sentencing contentions, we first examine, in light of the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), his assertion that his sentences violated the Sixth Amendment. Next, we assess the propriety of the contested sentencing enhancements. As explained below, Ruhbayan is entitled to resentencing under *Booker* and, in these circumstances, the four-level enhancement for his leadership role in the obstruction of justice scheme was improperly applied.

### 1.

Ruhbayan raised a Sixth Amendment challenge to his sentences for the first time on appeal. We are thus obliged to review that contention for plain error only, applying the principles of *United States v. Olano*, 507 U.S. 725, 732 (1993). *See United States v. Hughes*, No. 03-4172, 2005 WL 628224, at *5 (4th Cir. Mar. 16, 2005). The plain error mandate of *Olano* is satisfied if: (1) there was error; (2) it was plain;

and (3) it affected the defendant's substantial rights. 507 U.S. at 732. If these conditions are met, we may then exercise our discretion to notice the error, but only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted).

First, the sentencing court's imposition of a life sentence on Ruhbayan for witness tampering, plus three sixty-month concurrent sentences for conspiracy, perjury, and suborning perjury constitutes constitutional error under *Booker*. *See* 125 S. Ct. at 746 (holding that Sixth Amendment contravened when sentencing court, acting pursuant to Guidelines, imposes sentence greater than maximum authorized by facts found by jury alone). At sentencing, the court, *inter alia*, increased Ruhbayan's offense level by four levels, applying the § 3B1.1(a) enhancement for leadership of otherwise extensive criminal activity. *See* Findings Of Fact, *United States v. Ruhbayan*, No. 2:02cr29 (E.D. Va. Feb. 25, 2004). As such, it made factual determinations about the scope of Ruhbayan's criminal activity, and his role within it, by a preponderance of the evidence. The court committed Sixth Amendment error by relying on its own fact-finding to impose sentences greater than what was authorized by the jury verdict. *See Hughes*, 2005 WL 628224, at *5 (recognizing that imposition of sentence, "in part based on facts found by the judge, . . . constituted error").[9]

Second, the court's sentencing error was plain, because "'the law at the time of trial was settled and clearly contrary to the law at the time of appeal.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). Third, the error affected Ruhbayan's substantial rights, in that it "'actually affected the outcome of the proceedings.'" *Id.* at *5-6 (quoting *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998)). Because the court's calculation of the other enhancements and departures rested in part on its application of the § 3B1.1(a) enhancement, its reliance on facts beyond those authorized by the jury verdict permeated Ruhbayan's sentencing. And because the sentences

---

[9]Assuming, without deciding, that the trial court correctly calculated Ruhbayan's Criminal History Category at VI and his Offense Level at 32, application of the § 3B1.1(a) four-level enhancement (resulting in an Offense Level of 36) increased the applicable sentencing range by 62 months, from 210-262 months to 324-405 months.

imposed on Ruhbayan were greater than those authorized by the facts found by the jury alone (as in *Hughes*), and were increased on the basis of the judge-found facts, the sentencing error was prejudicial. *Id.* at *6.

Finally, we are obliged to exercise our discretion to notice the error with respect to Ruhbayan's sentences. As a result of the error, Ruhbayan was sentenced to a total term of imprisonment greater than that authorized by the jury verdict, seriously affecting "the fairness, integrity or public reputation of [the] judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotation marks omitted); *see also Hughes*, 2005 WL 628224, at *13. Furthermore, we have no indication as to what sentences the court would have imposed absent its impermissible fact-finding, in that its successive calculations, including the upward departure under § 5K2.0, were premised upon the application of § 3B1.1(a). We are thus obliged to vacate Ruhbayan's sentences and remand for resentencing consistent with *Booker* and its progeny. *See* 125 S. Ct. at 768-69.

2.

Under the first step of the *Booker* remedial scheme, a sentencing court must determine the range prescribed by the Guidelines after making any necessary findings of fact. *See Hughes*, 2005 WL 628224, at *14. As a result, the calculation issues raised in this appeal are likely to arise in the district court on remand. *See id.* We therefore briefly address Ruhbayan's most significant sentencing contention, that the sentencing court improperly applied a § 3B1.1(a) enhancement to his sentences.

Section 3B1.1(a) of the Guidelines provides that, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the sentencing court shall increase the offense level by four. USSG § 3B1.1(a). Ruhbayan does not challenge the sentencing court's determination that he was an organizer or leader within the meaning of § 3B1.1, but he asserts that the court erred in finding that his criminal activity was "otherwise extensive." In making such a determination, a sentencing court may consider "all persons involved during the course of the entire offense." USSG § 3B1.1, comment. (n. 3). For example, "a

fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* Here, the sentencing court found that, although Ruhbayan's scheme involved just two participants (Goodman and Ruhbayan), it was "otherwise extensive" because it included the unknowing services of Melton, his staff, and, "most importantly, the twelve jurors who returned verdicts based upon the perjured testimony presented at the [First Trial]." *United States v. Ruhbayan*, 302 F. Supp. 2d 634, 636 (E.D. Va. 2004).

In this situation, however, the jurors in the First Trial were the *objects* of Ruhbayan's criminal scheme to obstruct justice, and they could hardly have been involved in the commission of the offenses. For that reason, this situation is readily distinguishable from that underlying *United States v. Ellis*, 951 F.2d 580 (4th Cir. 1991) (Powell, J.), upon which the sentencing court relied. *Ellis* involved a scheme to corruptly secure the passage of legislation in West Virginia. Although the corrupt scheme involved only four participants, we upheld the application of the § 3B1.1(a) enhancement because the unknowing services of lobbyists, legislators, and their staffs advanced the criminal activity. *Ellis*, 951 F.2d at 585. In this case, the jurors in the First Trial did nothing to advance Ruhbayan's scheme. Ruhbayan's scheme was simply to obstruct justice by lying to the court and the jury and having his girlfriend do likewise, and it was not "otherwise extensive" under § 3B1.1(a). As a result, enhancing Ruhbayan's offense level under § 3B1.1(a) for exercising a leadership role in "otherwise extensive" criminal activity is not appropriate.

### III.

Pursuant to the foregoing, we affirm Ruhbayan's various convictions, but we vacate his sentences and remand for such resentencing proceedings as may be appropriate.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*