**UNITED STATES of America, Appellee,**

v.

**Arthur James WALKER, Appellant.**

**No. 85–5271.**

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1986.

Decided July 8, 1986.

Rehearing Denied July 31, 1986.

44

J. Brian Donnelly (McCardell, Donnelly, Benson & Miller, P.C., on brief), and Samuel W. Meekins, Jr. (Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., on brief), for appellant.

Tommy E. Miller, Asst. U.S. Atty. (Justin W. Williams, U.S. Atty., Robert J. Seidel, Jr., Asst. U.S. Atty., on brief), for appellee.

Before SPROUSE and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Arthur James Walker appeals from his convictions of espionage, conspiracy to commit espionage and several espionage-related offenses based on his transmittal of classified United States defense information to agents of the Soviet Union. Because we find no merit in any of his contentions, we affirm.

## I.

Arthur Walker retired from the United States Navy in 1973 after twenty years of service. In 1975, he started a business with his brother, John Walker. The business closed at the end of 1979, leaving the two brothers with substantial debts. In January 1980, John Walker told Arthur Walker that he had "friends" who would pay for classified defense information. Arthur Walker was aware that the "friends" were the Soviets. John Walker encouraged Arthur Walker to obtain a job with a defense contractor in order to gain access to classified information. On February 25, 1980, Arthur Walker took a position with VSE Corporation, a defense contractor located in Virginia Beach, Virginia. His job at VSE involved planning overhauls for Navy ships and undertaking various engineering assignments for the Navy.

On at least two occasions, Arthur Walker provided John Walker with documents containing classified information which he had obtained from VSE. On September 2, 1981, he removed a portion of the Damage Control Book for the USS Blue Ridge from the offices of VSE. The USS Blue Ridge and the identical USS Mount Whitney are the two most sophisticated communications ships in the United States Navy. The Damage Control Book is a classified document containing information used to aid a damaged ship. The book describes the ship's responses to damage, flood control procedures, stability and endurance. Arthur Walker took this material to John Walker's office in Virginia Beach, photo-

graphed it, and left the film in John Walker's desk. He returned the material to VSE the next day.

Arthur Walker again provided classified information to John Walker in April 1982, when he removed portions of the CAS REP Extract File No. 2 from the offices of VSE. A CAS REP, which stands for "casualty report," originates as a message sent by the commanding officer of a Navy ship when one of the ship's systems or pieces of equipment malfunctions, resulting in a reduction of the ship's mission capability. CAS REP Extract File No. 2, the document appropriated by Arthur Walker, contained the history of casualty reports for the Navy's five amphibious assault command ships from 1977 to November 1981. The information contained in the document indicated the date the casualty occurred, the location of the ship, the cause and severity of the damage, the identity of the damaged equipment and the activity and time necessary to effect repairs. Arthur Walker gave a portion of this document to John Walker in VSE's parking lot during his lunch hour. After John Walker photographed the document, he returned it to Arthur Walker, who returned it to VSE. Arthur Walker later took another portion of the CAS REP Extract File No. 2 to John Walker's office, photographed the material, and left the film in John Walker's desk. He later returned the material to VSE.[1]

In May 1984, John Walker asked Arthur Walker whether he was in a position to learn of changes in the United States' defense condition. Arthur Walker responded that if he saw something which he thought might indicate a change in defense conditions, he would inform John Walker. Approximately six months later, John Walker asked Arthur Walker whether he was familiar with overhaul schedules for Navy ships and could determine ship movements. Arthur Walker replied that he could provide information concerning when a Navy

---

**1.** In addition to the classified Damage Control Book and CAS REP materials, Arthur Walker provided John Walker with unclassified techni-

cal manuals and plans for Navy ships. John Walker paid Arthur Walker a total of $12,000 for the various types of defense information.

ship was approximately one year away from a scheduled overhaul.

Through a series of events not germane to this appeal, John Walker came under concentrated surveillance by the Federal Bureau of Investigation (FBI). He was arrested by the FBI on May 20, 1985 after attempting to pass classified defense information to an agent of the Soviet Union. During the surveillance of John Walker and a search of his home following his arrest, FBI agents discovered records which implicated Arthur Walker. FBI agents interrogated Arthur Walker for several days after John Walker's arrest. Arthur Walker then voluntarily testified before a federal grand jury in Baltimore investigating allegations of espionage against John Walker and his son, Michael Walker. In the course of the FBI interrogation and the grand jury testimony, Arthur Walker admitted to participating in the procurement and transfer of defense documents as described above.

Arthur Walker was subsequently indicted by a federal grand jury in the Eastern District of Virginia. He was tried by the district court without a jury and convicted of two counts of espionage and one count of conspiracy to commit espionage in violation of 18 U.S.C. § 794(a) and (c). He was also convicted of two counts of obtaining defense documents to be used to the injury of the United States in violation of 18 U.S.C. § 793(b) and two counts of unauthorized possession of defense information in violation of 18 U.S.C. § 793(e).

On appeal, Arthur Walker contends that the district court erred in refusing to dismiss the conspiracy charge under the principle of Wharton's Rule; that the Government failed to provide him with notice of the portions of the classified documents upon which it relied as required by the Classified Information Procedures Act, 18 U.S.C. App. § 10; that the district court erred in refusing to dismiss the espionage charges for insufficient evidence; that the district court erred in admitting evidence regarding John Walker's activities on May 19–20, 1985; and that there was insufficient evidence to support his conviction on each charge.

## II.

■ Generally, a conspiracy to commit an offense and the substantive offense underlying the conspiracy are distinct crimes which do not merge into a single punishable act, and a defendant in a proper case can be prosecuted both for the conspiracy and the substantive offense. *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). Wharton's Rule,[2] however, provides an exception to this general rule:

> An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.

*Iannelli v. United States*, 420 U.S. 770, 773 n. 5, 95 S.Ct. 1284, 1288 n. 5, 43 L.Ed.2d 616 (1975) (quoting 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 89, at 191 (1957)). Thus, a person cannot be prosecuted for conspiracy to commit adultery, incest, bigamy or dueling—the classic Wharton's Rule offenses—since the substantive crime necessarily requires concerted criminal activity. *Iannelli*, 420 U.S. at 782, 95 S.Ct. at 1292.

Walker asserts that his prosecution for espionage, 18 U.S.C. § 794(a), and conspiracy to commit espionage, 18 U.S.C. § 794(c), violates Wharton's Rule.[3] Ac-

---

**2.** An appellation derived from 2 F. Wharton *Criminal Law* § 1604, at 1862 (12th ed. 1932).

**3.** 18 U.S.C. § 794(a) and (c) provide:

(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book,

cording to Walker, section 794(a) requires the participation of two persons: the one who delivers the information and the one who receives it. Walker argues that the Government failed to establish the existence of any party to the agreement other than John Walker and himself; therefore, the conspiracy charge was duplicative and should have been dismissed under Wharton's Rule.

 Walker's argument fails for several reasons. First, Wharton's Rule is inapplicable when the conspiracy involves the cooperation of a greater number of persons than is required for commission of the substantive offense. *Iannelli*, 420 U.S. at 783 & n. 15, 95 S.Ct. at 1292–93 & n. 15. The Government introduced ample evidence to show the existence of additional Soviet agents who received the information from John Walker. Arthur Walker testified before the grand jury about conversations with John Walker in which John Walker described the methods he used to transfer defense information to Soviet agents in the United States and how, on at least one occasion, he had flown to Vienna, Austria to deliver material and receive money. The Government presented evidence concerning John Walker's activities on May 19–20, 1985, when he travelled to Rockville, Maryland and hid a bundle of classified documents and a letter along a roadside. Expert witnesses testified that John Walker's actions were characteristic of the manner in which Soviet agents passed information, and FBI agents testified that a Soviet diplomat spotted in the area where John Walker hid the documents fled the United States soon after John Walker's arrest. This evidence of additional parties to the conspiracy was sufficient to trigger the exception to Wharton's Rule.

 Second, Wharton's Rule is a judicial presumption which applies only in the absence of legislative intent that the conspiracy and the substantive offense are to remain separate crimes. *Iannelli*, 420 U.S. at 782, 95 S.Ct. at 1292. By enacting a separate conspiracy offense at section 794(c), Congress clearly expressed its intent to keep the two offenses distinct. *See Iannelli*, 420 U.S. at 786–91, 95 S.Ct. at 1294–97. Finally, even if the legislature's intent was not readily discernible, Wharton's Rule is only applicable if the substantive offense is imbued with certain distinctive characteristics: (1) the parties to the agreement are the only persons who participate in commission of the substantive offense; (2) the immediate consequences of the crime rest on the parties themselves rather than on society at large; and (3) the agreement that necessarily attends the substantive offense is not likely to generate additional agreements to engage in other criminal endeavors. *Iannelli*, 420 U.S. at 782–83, 95 S.Ct. at 1292–93. It takes no feat of reasoning to conclude that the crime of espionage does not fit this pattern. *United States v. Helmich*, 704 F.2d 547, 550 (11th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 353, 78 L.Ed.2d 317 (1983).

## III.

 Walker was convicted of violations of 18 U.S.C. § 794(a), § 794(c), § 793(b) and § 793(e). A common prerequisite for a conviction under each of these statutes is that the defendant have transmitted or gathered information "relating to" or "connected with" the national defense. Section 10 of the Classified Information Procedures Act provides:

> In any prosecution in which the United States must establish that material relates to the national defense or constitutes classified information, the United States shall notify the defendant, within

---

signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.

. . . . . .

(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.

the time before trial specified by the court, of the portions of the material that it reasonably expects to rely upon to establish the national defense or classified information element of the offense. 18 U.S.C. App. § 10. Walker contends that the district court should have excluded evidence concerning the Damage Control Book and the CAS REP Extract File No. 2 because the Government failed to notify him of the specific portions of these documents which it expected to rely upon to establish the national defense element of the offenses.

The Government's position throughout the proceedings below was that it intended to rely upon the entire compilation of each of the documents to establish their relation to the national defense. Walker was clearly put on notice of the Government's position prior to trial, and we fail to see any prejudice to his defense by a failure to subdivide the relation of these documents to the national defense.

### IV.

■ Walker was charged with two counts of espionage in violation of 18 U.S.C. § 794(a). He contends that the district court should have dismissed these charges because the Government failed to prove one of the elements of the crime: that Walker communicated, delivered or transmitted defense information to an agent of a foreign government. The gist of his argument is that the Government did not prove that John Walker was a Soviet agent or that John Walker ever passed the documents given to him by Arthur Walker to a Soviet agent.

This argument fails because the Government presented sufficient evidence to prove that John Walker was a Soviet agent. In addition to the evidence concerning John Walker's contacts with other Soviet agents previously discussed in section II of this opinion, FBI Special Agent Hodges testified regarding statements made by Arthur Walker during interviews with the FBI. Arthur Walker stated to Agent Hodges that John Walker had told him during their initial 1980 conversation that he could make money by providing classified information to some friends. Agent Hodges testified that when he asked who the friends were, Arthur Walker replied that they were the "Russians." When Agent Hodges asked whether he meant the Soviets, Hodges testified that Arthur Walker responded, "No, we did not call them Soviets; we called them Russians." Arthur Walker also told Agent Hodges that John Walker told him during the same 1980 conversation that he became involved with the Russians by repeatedly parking near the Russian Embassy in Washington, D.C. until he was finally contacted. These statements, corroborated by the Government's independent evidence regarding John Walker's activities on May 19–20, 1985, were sufficient to show that John Walker was a Soviet agent. *See Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *Scarbeck v. United States*, 317 F.2d 546, 565–69 (D.C.Cir.1962), *cert. denied*, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963). The district court, therefore, properly denied Walker's motion to dismiss the espionage charges.

### V.

The Government introduced into evidence at Arthur Walker's trial a letter discussing espionage activities with "K" which John Walker left together with classified documents along a roadside on May 19, 1985. The Government also introduced into evidence an index card and a piece of paper seized from John Walker's home which identified "K" as Arthur Walker. The district court admitted the evidence pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence which provides that statements made by a co-conspirator "during the course and in furtherance of the conspiracy" are not hearsay.

Walker contends that Rule 801(d)(2)(E) is not applicable because the statements in the letter and papers were not made during the course and in furtherance of the conspiracy. He argues that the conspiracy terminated in April 1982 after he passed

the final set of defense documents to John Walker, while the letter and papers related to John Walker's espionage activities in May 1985, over three years after the termination of the conspiracy.

Once a conspiracy is established, however, it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. *Hyde v. United States*, 225 U.S. 347, 369–70, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). A mere cessation of activity in furtherance of the conspiracy is insufficient. *United States v. Goldberg*, 401 F.2d 644, 648 (2d Cir.1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his co-conspirators. *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978). The burden of proving withdrawal rests on the defendant. *United States v. Gillen*, 599 F.2d 541, 548 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979).

In the instant case, Arthur Walker failed to introduce any evidence tending to show his withdrawal from the conspiracy. In fact, he told the FBI that in May 1984 he had agreed to provide John Walker with any information he obtained relating to the United States' defense condition. Six months before John Walker's arrest, he told John Walker that he could provide information concerning the scheduling of Navy ships for overhauls. The district court correctly ruled that the letter and papers were relevant evidence admissible under Rule 801(d)(2)(E).

## VI.

Walker's final challenge is upon the sufficiency of the evidence underlying his convictions. He contends that the Government's evidence was insufficient to prove: that the Damage Control Book and CAS REP Extract File No. 2 introduced into evidence were the same as the documents he actually passed to John Walker; that the information contained in the two documents was "connected with" or "relat[ed] to the national defense," 18 U.S.C. §§ 793, 794; that he acted "with intent or reason to believe that the information [was] to be used to the injury of the United States, or to the advantage of any foreign nation," 18 U.S.C. §§ 793, 794; and that John Walker actually received the film of the two documents and that the film was successfully developed into photographs.[4] Considering the evidence in the light most favorable to the Government, we conclude that a rational trier of fact could find that each of the offenses was proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Finding no merit to any of Walker's contentions, we affirm.

AFFIRMED.

---

4. Walker further contends that transferring undeveloped film is not prohibited by sections 793 and 794 as those provisions speak only to "pho-tographs." This argument is completely devoid of merit.