**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 08-4372**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY WILKINS,

Defendant - Appellant.

---

**No. 08-4633**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KENNETH HOWARD,

Defendant – Appellant.

---

**No. 08-4635**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

PIERRE GENTRY,

　　　　　Defendant – Appellant.

---

Appeals from the United States District Court for the District of South Carolina, at Spartanburg. Henry F. Floyd, District Judge. (7:07-cr-00294-HFF-6; 7:07-cr-00294-HFF-7; 7:07-cr-00294-HFF-9)

---

Argued: October 29, 2009　　　　　Decided: December 4, 2009

---

Before MOTZ and KING, Circuit Judges, and Anthony J. TRENGA, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Joseph Bradley Bennett, SALVINI & BENNETT, LLC, Greenville, South Carolina; Jeffrey Falkner Wilkes, Greenville, South Carolina; Cameron Boggs, BOGGS LAW FIRM, Greenville, South Carolina, for Appellants. William J. Watkins, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. **ON BRIEF:** Jessica Salvini, SALVINI & BENNETT, LLC, Greenville, South Carolina, for Appellant Anthony Wilkins. W. Walter Wilkins, United States Attorney, Columbia, South Carolina, Regan A. Pendleton, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants Anthony Wilkins, Kenneth Howard, and Pierre Gentry (collectively, the "defendants") appeal from their jury convictions in the District of South Carolina for being involved in a wide-ranging cocaine and cocaine base distribution conspiracy, in contravention of 21 U.S.C. § 846. The defendants challenge their convictions on multiple grounds, and Gentry also contests his sentence. More specifically, Wilkins and Gentry assert that the district court erred in denying (1) their motions for judgments of acquittal on statute of limitations grounds, (2) the request for a multiple conspiracy instruction, and (3) their motion for a mistrial due to prejudicial security measures at the courthouse. Gentry also contests an evidentiary ruling made by the trial court on a coconspirator's statement and the court's attribution of a single criminal history point for a prior marijuana possession conviction. Finally, Howard pursues an ineffective assistance of counsel claim. As explained below, we reject the defendants' various appellate contentions and affirm the judgments.

I.

A.

On March 14, 2007, a group of twenty individuals, including the defendants, were charged in Count One of a three-count

3

indictment with conspiracy to distribute cocaine and cocaine base (also known as "crack").[1]  On January 7, 2008, the defendants went to trial in Spartanburg, South Carolina, for this offense, of which they were convicted three days later. The verdict attributed sixty-five kilograms of cocaine but no crack to Wilkins; 296 kilograms of cocaine and fifteen ounces of crack to Gentry; and 132 kilograms of cocaine but no crack to Howard.  On the basis of their convictions, Wilkins, Gentry, and Howard were sentenced, respectively, to 240, 360, and 253 months in custody, plus five years of supervised release.

---

[1] More specifically, the allegations of the conspiracy in Count One of the indictment included the following:

> [B]eginning at least on or about August 1, 2000, and continuing thereafter, up to and including the date of this Indictment, in the District of South Carolina and elsewhere, the Defendants, FNU LNU, a/k/a "Little Joe," SCOTT MOSLEY, CHARLES REED, a/k/a "Milton Dixon," ERIC JENKINS, MARCUS CHAMBERLAIN, ANTHONY WILKINS, KENNETH HOWARD, ELIZANDRO MARTELL-PONCE, a/k/a "Alex," PIERRE GENTRY, NATHANIEL HARRIS, JIMMY HALL, DERRICK SIMMONS, ERIC JONES, LONDON ANDERSON, JERRY SIMPSON, DANIEL GREGORY, DALLAS SAMUEL, TRAVIS WILSON, TRAVIS KENNEDY and LACARLA DAVIS, knowingly and intentionally did combine, conspire and agree together and have tacit understanding with each other and others, known and unknown . . . , to knowingly, intentionally and unlawfully possess with intent to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base (commonly known as "crack" cocaine) . . . .

J.A. 12-13 (emphasis omitted).  (Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.)

B.

1.

The trial evidence established that the conspiracy involved the transportation and distribution of substantial quantities of cocaine and crack along the I-85 corridor from Texas to Georgia, South Carolina, and North Carolina, with additional drugs being shipped from California to South Carolina.[2] The authorities initially learned of this scheme when one of the conspirators, Brad Williams, came forward with information concerning a homicide investigation in Spartanburg. Through their dealings with Williams, the Spartanburg authorities and the FBI identified and pursued the conspiracy's network of drug dealers along the I-85 corridor.[3]

At trial, the prosecution presented sixteen witnesses, including five cooperating codefendants and several other coconspirators, who established the defendants' involvement in

---

[2] We recount the relevant facts in the light most favorable to the prosecution, as the prevailing party below. United States v. Bursey, 416 F.3d 301, 304 n.1 (4th Cir. 2005).

[3] To facilitate their drug distribution scheme, various conspirators from Texas and South Carolina acquired residences in Georgia, a convenient location between those states. Multiple residences were affordable because, as the sentencing court estimated, the drugs involved in the conspiracy had a wholesale value of $20 million to $30 million. Indeed, during the conspiracy a kilogram (also known as a "kilo" or a "key") of cocaine sold for between $20,500 and $28,000.

the charged conspiracy. Seeking to impeach the credibility of prosecution witnesses and denying involvement in the conspiracy, the defense presented eight witnesses, including defendants Gentry and Howard personally. The evidence revealed a multifaceted drug trafficking scheme, with key participants introducing other conspirators to each another and the drug distribution business.

By way of example, defendant Wilkins introduced Brad Williams to coconspirators Eric Jenkins and Charles Reed, who were drug suppliers from Texas. The first meeting between Williams and Jenkins occurred in 2000 at one of Wilkins's homes in South Carolina, where Williams was living while evading the authorities. Indeed, Williams and Jenkins met when Jenkins delivered two kilograms of cocaine to Wilkins.[4] From 2000 to 2002, Williams purchased an estimated 1500 to 1800 kilograms of cocaine from the Texas traffickers (Jenkins and Reed) and sold at least thirty kilograms of cocaine to Wilkins. Additionally, Wilkins introduced Williams to Marcus Chamberlain, a drug dealer in Charlotte to whom Williams ultimately delivered substantial quantities of cocaine. From 2001 to 2003, Williams fronted at least 600 kilograms of cocaine to Chamberlain, who was a charged

---

[4] When Williams and Jenkins first met, Jenkins actually brought four kilograms of cocaine to Wilkins's home, splitting it evenly between himself and Wilkins.

coconspirator in the indictment.[5]  Moreover, one of Williams's primary drug dealers in Spartanburg, Rashard McKinney, sold crack to defendant Gentry that he had purchased from Williams.

At trial, Reed acknowledged being "the one getting the drugs here . . . to Spartanburg" from Texas.  J.A. 355.[6]  Reed had met defendant Wilkins through Wilkins's cousin, a man named D.C. Black.  At their initial meeting, Reed sold Wilkins 250 grams of cocaine; Reed thereafter ensured that Wilkins received cocaine from each of Reed's drug deliveries to South Carolina from Texas, aggregating thirty to thirty-five kilograms by 2002. Further, Reed had a residence in Atlanta to which Williams and Wilkins travelled to purchase cocaine.

In addition to introducing defendant Wilkins to Reed, Black facilitated several drug deals for Wilkins, including one in May 2006 involving a confidential informant named Jermaine Monroe. Black twice purchased cocaine from his friend defendant Howard, with whom Black — and other prosecution witnesses — often played cards.  One of the card players was Gary Paden, who Black

---

[5] The "fronting" of drugs occurs when a supplier provides quantities of drugs to a dealer on consignment, with payment being made to the supplier from the proceeds of the dealer's ultimate sales.  See Wolfe v. Johnson, 565 F.3d 140, 145 (4th Cir. 2009).

[6] Two of Reed's suppliers, codefendants "Little Joe" and Scott Mosley, were fugitives at the time of the defendants' trial.

7

had introduced to Howard. Paden purchased large quantities of cocaine from Howard — a quarter to half a kilogram each time — once or twice a week for a year. Paden also purchased drugs from Brad Williams, Black, Monroe, and, indirectly, from defendant Gentry, who Paden dealt with through Jermaine Monroe. In contrast, from 2001 to 2005, coconspirator Michael Rosenberg purchased three to five kilograms of cocaine — a quarter of a kilogram at a time — directly from Gentry.

From 2000 to 2006, coconspirator Daniel Gregory purchased one to two kilograms of cocaine per week from defendant Gentry. Gregory also had cocaine transactions with coconspirator Eric Jones, who Gentry had introduced to drug dealing. During a one-year period ending in 2006, Jones purchased, sometimes on a fronting basis, twenty to twenty-five kilograms of cocaine from Gentry. Additionally, Gentry was involved in cocaine transactions with Terry Feaster, who Gregory had introduced to Gentry. Feaster was also involved in large-quantity cocaine transactions with defendant Howard, who Feaster characterized as a friend who "had a family member who . . . had the kilos." J.A. 196. Between 2001 and 2003, Feaster purchased cocaine from Howard on about ten occasions, each time acquiring between one and two kilograms. During this period, Howard also rented an apartment for Feaster's use in Spartanburg.

Of significance, defendant Howard also engaged in drug transactions with a man named V. Wilkins.[7] Describing Howard as merely one of his "minor sources" for cocaine, V. Wilkins explained, "I never met [Howard]. I just been to his house and on his property." J.A. 246. According to V. Wilkins, his "middle man connection," a man named Gregory McHam, had physically purchased the cocaine from Howard. Id. More specifically, to purchase a kilogram of cocaine from Howard, V. Wilkins would give McHam $24,000 in cash; McHam would then take V. Wilkins's and his own money into Howard's residence in Spartanburg and return with two kilograms of cocaine, one for V. Wilkins and one for McHam. A major portion of the drug weight attributed to Howard by the verdict — 104 of 132 kilograms — was predicated on V. Wilkins's testimony.

2.

During the trial, the defendants made a variety of motions and objections that are relevant to their appellate contentions. Defendants Wilkins and Gentry sought judgments of acquittal, pursuant to Federal Rule of Criminal Procedure 29, premised upon

---

[7] In the record and on appeal, V. Wilkins's first name is generally spelled "Verlantra." In a new trial motion and supporting affidavit, however, his name is spelled "Velontray." We refer to him as "V. Wilkins."

a statute of limitations contention.[8]  Wilkins also requested a multiple conspiracy jury instruction.  Gentry objected to the evidentiary use of certain testimony from Feaster, who was recounting a statement made to him by Gregory, under the coconspirator hearsay exception of Federal Rule of Evidence 801(d)(2)(E) (the "coconspirator exception").  The trial court denied these requests and overruled Gentry's evidence objection.

### 3.

After court recessed on the first day of trial, an incident occurred near the Spartanburg courthouse that gives rise to an appellate contention pursued by defendants Wilkins and Gentry.  On that occasion, a disturbance arose "toward the back of the [federal] courthouse."  J.A. 189.  The Spartanburg police requested that the prosecutor notify the trial judge of the fracas, which apparently involved people yelling and screaming at each other.  The prosecutor informed the court of the incident early on the second day of trial, outside the presence of the jury.  In response, the court indicated its awareness of the situation and noted that precautions had been taken.  The court then stated from the bench:

---

[8] It is somewhat ambiguous whether defendant Gentry actually sought judgment of acquittal on the limitations contention.  We accord him the benefit of doubt, however, and treat such relief as having been sought.

10

> I don't know whether it pertains to anybody in the audience or not, but if it does and if they arrest you on federal property, I'll be dealing with you and not some state magistrate, so if you can't control your conduct around here, just go somewhere else, but you're welcome to be here as long as you can behave.

Id. After the court's statement, the jury returned to the courtroom and the trial proceeded.

It was later discovered that the disruption had involved "members of the defendants' family," see J.A. 574, prompting a heightened police presence around the courthouse during the jury deliberations. On January 10, 2008, immediately prior to the jury retiring to deliberate, several police vehicles, including marked and unmarked cars and an unmarked armored truck, arrived outside the courthouse. In addition, a police helicopter conducted flyovers nearby. The police officers remained in their vehicles, however, and no juror reported any awareness of the heightened security measures. Nevertheless, after the jury returned its verdicts, the defendants sought a mistrial because of these measures. The court denied the mistrial request.

4.

On January 10, 2008, the jury returned its verdicts, finding each of the defendants guilty on Count One.[9] Soon

---

[9] A fourth codefendant, Nathaniel Harris, was tried with the defendants, but the jury was initially unable to reach a verdict on him. After returning its verdicts against the defendants, the jury resumed deliberations with respect to Harris. The
(Continued)

11

thereafter, defendant Howard secured a new lawyer, who sought post-trial relief for Howard on the basis of newly discovered evidence.

In support of Howard's motion for a new trial, filed on February 26, 2008, he submitted the affidavit of Gregory McHam — the "middle man connection" of V. Wilkins, see J.A. 246 — asserting that McHam did not even know V. Wilkins and had never purchased drugs from Howard.  In response, the prosecution acknowledged that it had not interviewed McHam, but asserted that it had provided McHam's identity to the defense during pretrial discovery and that Howard's lawyer thus had the opportunity to investigate him.  The prosecution contended that, in any event, Howard failed to show that he would have been acquitted by McHam's testimony, as it would merely impeach that of V. Wilkins.  At Howard's sentencing hearing on April 28, 2008, the court ruled from the bench that such evidence was "not newly discovered," but was instead "available to [Howard's] counsel and there's no indication of the exercise of due diligence."  J.A. 593.  The court thus denied Howard's motion, agreeing that the evidence was impeaching and "would not necessarily result in an acquittal at trial."  Id.

_____

prosecution and Harris then entered into a plea agreement, which resolved the trial as to Harris.

After completion of his Presentence Investigation Report, defendant Gentry objected to its attribution of a single criminal history point, pursuant to Guidelines section 4A1.1(c), based on his 2003 conviction in Maryland for possession of marijuana. Gentry contended that this conviction should instead have constituted part of the "instant offense" of conviction, under Guidelines section 4A1.2, precluding the attribution of a criminal history point. In Gentry's sentencing hearing on April 29, 2008, the court rejected this assertion, finding that "there was absolutely no evidence of marijuana use during the course of the conspiracy by any of the persons involved in the conspiracy." J.A. 669.

5.

The defendants have each filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. The defendants' three separate appeals have been consolidated for disposition in this Court.

Defendants Wilkins and Gentry maintain on appeal that the district court erred in denying (1) their motions for judgments of acquittal on statute of limitations grounds, (2) the request for a multiple conspiracy instruction, and (3) their motion for a mistrial premised on the heightened security measures during the jury deliberations. Gentry also appeals the court's evidentiary ruling on the coconspirator exception and the

13

court's attribution of a single criminal history point for his 2003 marijuana conviction. Finally, defendant Howard seeks relief for the ineffective assistance of counsel, premised primarily on his trial lawyer's failure to properly investigate the case.

## II.

We review de novo a trial court's denial of a motion for judgment of acquittal, recognizing that a guilty verdict must be upheld if it is supported by substantial evidence. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). We also review de novo the question of whether prosecution has been pursued in a timely manner, in the context of an applicable statute of limitations. United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1398 (4th Cir. 1993). We review for abuse of discretion a trial court's decision on whether to give a proposed jury instruction. United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). We also review for abuse of discretion a trial court's ruling on a mistrial motion, United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997), as well as its evidentiary rulings, United States v. Smith, 441 F.3d 254, 261 (4th Cir. 2006). In assessing whether a district court has properly applied the Guidelines, we review factual findings for clear error. United States v. Allen, 446 F.3d 522, 527 (4th

14

Cir. 2006). Finally, an ineffective assistance of counsel claim is cognizable on direct appeal only when the record conclusively demonstrates that the defense lawyer failed to provide effective representation. United States v. Benton, 523 F.3d 424, 435 (4th Cir. 2008).

III.

A.

Defendants Wilkins and Gentry contend that the district court should have granted them judgments of acquittal because the applicable statute of limitations barred their prosecution. The indictment was returned in March 2007, and the applicable five-year statute of limitations thus bars the prosecution of offenses that occurred prior to March 2002. See 18 U.S.C. § 3282(a) (providing that "no person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is [returned] within five years"). Unfortunately for Gentry, multiple witnesses confirmed his involvement in very substantial drug transactions within five years of the indictment. For example, Gregory had purchased cocaine from Gentry from 2000 to 2006, and Jones purchased cocaine from him in both 2005 and 2006.

Although the evidence regarding Wilkins's drug-dealing is somewhat more circumscribed — involving conduct prior to 2002

15

and then in 2006 — his limitations contention also fails to pass legal muster.  In support thereof, Wilkins argues that his 2006 cocaine transaction with Monroe at Black's home in Spartanburg was an isolated event, distinct from his earlier conspiratorial dealings in 2000 and 2001.  Wilkins nevertheless failed to show that he ever withdrew from the conspiracy.  And, under our precedent,

> [o]nce a conspiracy is established . . . it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. A mere cessation of activity in furtherance of the conspiracy is insufficient.  The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his co-conspirators.  The burden of proving withdrawal rests on the defendant.

United States v. Walker, 796 F.2d 43, 49 (4th Cir. 1986) (citations omitted).  Simply put, Wilkins presented no evidence that he withdrew from the conspiracy or that it ended before March 2002.[10]

---

[10] Generally, pursuant to the continuing offense doctrine, only one relevant aspect of a conspiracy need have occurred during the limitations period for a prosecution to be timely. See Brown v. Elliot, 225 U.S. 392, 401 (1912).  Since no overt acts are required to sustain a conviction for a drug conspiracy under 21 U.S.C. § 846, see United States v. Shabani, 513 U.S. 10, 15 (1994), the dispositive consideration for Wilkins's limitations claim is whether he withdrew from the conspiracy or the conspiracy ended outside the five-year limitations period. See Walker, 796 F.2d at 49; see also United States v. Seher, 562 F.3d 1344, 1364 (11th Cir. 2009) ("The government satisfies the requirements of the statute of limitations for a non-overt act conspiracy if it alleges and proves that the conspiracy (Continued)

Furthermore, Wilkins's assertion of an isolated 2006 cocaine transaction — independent of the charged conspiracy — is not at all supported by the record. The 2006 incident involved a monitored transaction between Wilkins and informant Monroe at Black's home. Notably, Monroe and Black both had a history of involvement in the charged conspiracy: Monroe was "the first guy [Reed] met" on Reed's first trip with Jenkins to South Carolina when the Texas participants were seeking to expand their business. J.A. 356. Reed met Black on his second trip, and Black then introduced Reed to Wilkins, to whom Reed sold cocaine on his subsequent trips. Moreover, Monroe, in agreeing to cooperate against Wilkins, acknowledged to one of the officers, "I can't actually call Mr. Wilkins himself. I have to go through his cousin [Black]." Id. at 32. This evidence, viewed in the proper light, confirms a continuing conspiratorial relationship, undermining Wilkins's limitations contention. Finally, although Black's testimony focused on the monitored transaction between Wilkins and Monroe, Black further acknowledged that (1) he was a drug dealer, (2) he had acquired drugs from Wilkins, and (3) people would pay him for the drugs and he would "give [the money] to [Wilkins]." See id. at 176-

continued into the limitations period." (internal quotation marks omitted)).

17

77. Notably, Black used the plural "they" when testifying to cocaine deals, further demonstrating that Wilkins's transaction with Monroe was not an isolated event.

## B.

Defendants Gentry and Wilkins next challenge the trial court's denial of a multiple conspiracy jury instruction, claiming the ruling constituted reversible error because such an instruction could have affected the drug weights attributed to them, as well as their limitations claims. More particularly, Wilkins maintains that the issue of whether he was part of the alleged conspiracy, rather than involved in some other conspiracy that terminated in 2001, should have been submitted to the jury. A primary basis for Wilkins's pursuit of the multiple conspiracy instruction was the lack of evidence concerning his participation in the alleged conspiracy from 2002 to 2006. Notably, however, Wilkins was incarcerated from 2002 to 2004. Wilkins also argued at trial that the evidence actually proved three separate conspiracies: one in Texas, one in the Carolinas, and one in Georgia. On the other hand, the prosecution maintained that a multiple conspiracy instruction would be confusing and that "if nothing else, [Reed] and Pierre Gentry and Mr. Wilkins connect all three of those conspiracies." J.A. 525. On appeal, Wilkins and Gentry maintain that two separate conspiracies were proven, separated by a four-year

18

period, with the earlier one obtaining cocaine from Texas and the later one securing it from California.  See, e.g., id. at 195 (discussing Feaster's method of acquiring cocaine via FedEx deliveries from California).

The determination of whether multiple conspiracies exist generally depends upon the overlap of goals, methods, and key actors.  See United States v. Nunez, 432 F.3d 573, 578 (4th Cir. 2005).  Indeed, as we have recognized, a single conspiracy can be comprised of a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market."  Id. (internal quotation marks omitted).  Moreover, a multiple conspiracy instruction is not required unless the evidence shows that a particular defendant was involved only in an entirely separate conspiracy, unrelated to the conspiracy charged.  See United States v. Squillacote, 221 F.3d 542, 574 (4th Cir. 2000).

In this prosecution, as the trial court observed, "the evidence supports the idea that this [was] one ongoing continuous conspiracy."  J.A. 526.  For example, the evidence linked the defendants to a single drug consortium, with Feaster linked to drug dealings with both Howard and Gentry, Black to drug dealings with Howard and Wilkins, and Williams to such dealings with Gentry and Wilkins.  And there was extensive

19

evidence that these conspirators, including Wilkins, Black, and Gentry, had introduced other participants to each other and the drug-dealing business. We note, as well, that the defendants asserted at trial that three conspiracies had been proven, but argue on appeal that two different conspiracies were shown, which confirms the potential merit of the prosecution's concern about juror confusion. In these circumstances, the trial court did not abuse its discretion in declining the request for a multiple conspiracy instruction.

### C.

Defendants Wilkins and Gentry next assert that "an extreme police presence during the jury deliberations" unduly influenced the jury and requires that their convictions be vacated. Br. of Appellants 19. They maintain that the jury must have been aware of the heightened security measures being undertaken, because a window in the jury room overlooked the street where the police officers and vehicles were massing, and because a helicopter flew over the courthouse. They contend that the sudden advent of such security measures during the trial's deliberation phase necessarily biased the jury by creating the impression that the defendants were dangerous. Accordingly, they assert that the trial court erred in denying their request for a mistrial.

As the Supreme Court has observed, in the proper circumstances, even the conspicuous "deployment of security

20

personnel in a courtroom during trial" is not inherently prejudicial. See Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986). Underlying this rule is the recognition that "society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." Id. at 569. In evaluating this mistrial contention, however, "the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk [was] presented of impermissible factors coming into play." Id. at 570 (internal quotation marks omitted). Thus, we must "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to [the] defendant's right to a fair trial." Id. at 572. Nonetheless, "if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Id.

Importantly, the heightened security measures occurred outside the courthouse and thus would have been visible only through a window. In denying the mistrial request, the trial court found, inter alia, that an alleged SWAT van was actually an unmarked vehicle resembling an armored car; that the officers were in their vehicles rather than milling about on the street;

21

and that unmarked cars and those with tinted windows are not necessarily suspicion-inducing.  The court then reasoned that these measures, even if seen by the jury, could not have been intimidating since the jury, rather than rushing to find defendant Harris guilty, continued its deliberations on his case even after delivering its verdicts with respect to the defendants.  See supra note 9.  Finally, the court recognized that (1) the heightened security measures were necessitated by the family members' actions on the first day of trial; (2) no jurors expressed concern over the security measures, which did not begin until after the jury was in the courtroom; (3) that area of Spartanburg generally has a substantial police presence; and (4) there are two courthouses on that particular street, and the marked Sheriff's vehicle could readily be perceived as connected to the nearby county courthouse.

In these circumstances, these security measures have not been shown to be so inherently prejudicial as to pose a threat to a fair trial, and the trial court's denial of the mistrial request was well within its discretion.

D.

Defendant Gentry next asserts that the trial court erred in admitting a statement by Gregory under the coconspirator exception, which provides that a statement is not hearsay if it is offered against a party and was made "by a coconspirator of a

22

party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In pursuing this contention, Gentry maintains that the court erred in admitting Feaster's rendition of a statement that Gregory had made to Feaster with respect to a cocaine deal. More specifically, Gentry argues that the court erroneously admitted Feaster's testimony after finding only that some drug conspiracy existed, and not first finding that the speaker (Gregory) was a coconspirator and that the statement was made in furtherance of the charged conspiracy. The disputed interchange follows:

> [Prosecutor]: What sort of business relationship did you develop with Pierre Gentry as far as dope was concerned?

> [Feaster]: Well, when [Gregory] got out, he hollered at me. I was — I had some keys. He called me and told me that Pierre wanted to get some, so I —

J.A. 193-94. The heart of Gentry's contention is that the prosecution had not linked Gregory and Gentry as members of the alleged conspiracy prior to the court's admission of this statement, thereby precluding a determination that Gregory made the statement to Feaster in furtherance of the conspiracy.

In handling an evidentiary issue such as this, it is notable that a trial court possesses the discretion "to conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission." United States v. Blevins, 960 F.2d 1252, 1256 (4th

23

Cir. 1992). Moreover, an appeals court "may affirm a judgment where the record reveals that the co-conspirator's statements were plainly admissible, whether or not a detailed rationale for admitting the statements has been stated by the trial court." Id.

Put simply, this record provides more than ample support for the proposition that the requirements of the coconspirator exception were satisfied. First, when he provided the challenged testimony, Feaster had already testified that he met defendant Gentry "through a mutual friend . . . Daniel Gregory," who had already been convicted of the conspiracy offense. See J.A. 192-93. Second, Gregory himself testified for the prosecution — acknowledging his own drug dealings with Gentry — and was thus subject to cross-examination. For example, Gregory admitted that he "would set up the drug deals and [Gentry] would assist [him] on getting [them] accomplished, making drug deals go through." Id. at 258. According to Gregory, he introduced Feaster to Gentry "so we could establish some drug deals." Id. at 262. Other coconspirators also testified to Gentry's participation in the conspiracy. See, e.g., id. at 271-72 (Jones); id. at 305 (LaCarla Davis); id. at 393 (Rosenberg). Third, Gregory's contested statement to Feaster was made around the year 2004, during the timeframe of the conspiracy and at a point when Gentry was selling large quantities of cocaine. See

24

id. at 262 (2004); id. at 393 (2001-05).  Finally, Gregory's statement to Feaster satisfies the "in furtherance of" component of the coconspirator exception, for the statement was "designed to induce [the listener] either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives." United States v. Shores, 33 F.3d 438, 444 (4th Cir. 1994).  In these circumstances, the trial court did not abuse its discretion in ruling that the challenged statement was admissible under the coconspirator exception.

E.

Defendant Gentry's final contention is that the court erred in awarding a single criminal history point for his 2003 possession of marijuana conviction.  Pursuant to Guidelines section 4A1.1(c), a single criminal history point should be awarded for "each prior sentence not [already] counted," with a "prior sentence" defined in Guidelines section 4A1.2(a)(1) as "any sentence previously imposed . . . for conduct not part of the instant offense."  Gentry contends that the evidence shows that the alleged conspiracy involved marijuana — as well as cocaine and crack — since Black admitted to purchasing marijuana from the Texas conspirators in 1998 and 1999.

This contention fails for multiple reasons.  First, Gentry's 2003 conviction was in Maryland, outside the geographic scope of the alleged conspiracy.  Moreover, his 2003 conviction

25

was for marijuana possession only, as opposed to possession with intent to distribute, and the only punishment was a fine. These facts suggest that only a small quantity of marijuana was involved in the 2003 case and further distinguish Gentry's Maryland conduct from the alleged conspiracy. This conclusion also comports with Gentry's admission that he experimented with marijuana. Thus, the court did not clearly err in finding that Gentry's 2003 marijuana conviction was for conduct that was not part of the charged conspiracy. Accordingly, this sentencing contention must also be rejected.

### F.

Finally, defendant Howard asserts an ineffective assistance of counsel claim, which has two main components: his trial counsel failed to properly investigate (as seen in his failure to interview Gregory McHam), and actually argued in favor of the prosecution in his closing argument. To establish constitutionally ineffective assistance of counsel, Howard is obliged to show (1) objectively unreasonable performance and (2) prejudice resulting from that deficient performance. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Generally, an ineffective assistance of counsel claim "should be raised by a habeas corpus motion under 28 U.S.C. § 2255 in the district court and not on direct appeal, unless it conclusively appears from the record that defense counsel did not provide effective

26

representation." United States v. Richardson, 195 F.3d 192, 198 (4th Cir. 1999) (internal quotation marks and alteration omitted).

Put simply, our review of the record leads to the conclusion that it fails to "conclusively establish" ineffective assistance of counsel. See United States v. King, 119 F.3d 290, 295 (4th Cir. 1997) (rejecting ineffective assistance of counsel claim on direct appeal); see also Massaro v. United States, 538 U.S. 500, 504, 505, 506 (2003) (recognizing that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance" because the trial record is "often incomplete or inadequate for [addressing such claims on direct review,]" thereby risking the failure of "[e]ven meritorious claims"); cf. United States v. Fisher, 477 F.2d 300, 302 (4th Cir. 1973) (addressing ineffective assistance claim on direct appeal because record clearly revealed counsel had only one hour to prepare for trial). In these circumstances, Howard's ineffective assistance of counsel claim is not cognizable on direct appeal.

IV.

Pursuant to the foregoing, we reject each of the defendants' contentions and affirm the judgments.

AFFIRMED

27