# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-241

STATE OF LOUISIANA

VERSUS

AUSTIN W. DYESS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 16-838
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

### VAN H. KYZAR
### JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and Van H. Kyzar, Judges.

**AFFIRMED.**

Edward K. Bauman
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT/APPELLANT:
     Austin W. Dyess

J. Reed Walters
District Attorney
Twenty-Eighth Judicial District
P. O. Box 1940
Jena, LA 71342
(318) 992-8282
COUNSEL FOR APPELLEE:
     State of Louisiana

**KYZAR, Judge.**

Defendant, Austin W. Dyess, appeals his convictions for second degree murder and conspiracy to commit second degree murder. For the reasons set forth herein, we affirm.

## DICUSSION OF THE RECORD

On June 22, 2016, a grand jury indicted Defendant on one count of second degree murder, in violation of La.R.S. 14:30.1; and one count of conspiracy to commit second degree murder, violations of La.R.S. 14:26 and 14:30.1. On September 25, 2017, Defendant proceeded to trial, and on September 27, 2017, a unanimous jury found Defendant guilty as charged on both counts.

On December 5, 2017, Defendant was sentenced to serve life imprisonment at hard labor for the second degree murder conviction, as well as thirty years imprisonment at hard labor for the conspiracy to commit murder. The sentences were ordered to run concurrently, and the life sentence was to be served without benefit of probation, parole, or suspension of sentence. Defendant did not file a motion to reconsider sentence.

The facts as presented at trial established that on April 24, 2016, the victim, Demond Garner, and his girlfriend, Chelsea Copling, both residents of Texas, attended a small party at the home of Joshua Sant in Tullos, LaSalle Parish. The couple left the party with Mr. Sant and Defendant and were subsequently found dead from gunshot wounds on April 27, 2016.

The LaSalle Parish Sheriff's Office (LPSO) initially received a report of the missing couple on April 25, 2016, from the Tullos Police Department, and began an investigation, which led detectives to the home of Mr. Sant as being the last place that the couple was seen. They discovered that Defendant was present at the home the night that the couple went missing. During the course of the

investigation, Defendant gave a series of statements to the detectives with LPSO, which will be discussed separately.

### Written Statement

On April 26, 2016, Defendant provided a written statement to Chief of Police Gary McDaniel of the Tullos Police Department and LPSO Deputy Joseph Cain, in which he claimed that he was at Mr. Sant's house along with a "couple," later identified as the murder victims. He further stated that they were all playing a game of beer pong when the couple said they were ready to go home and began walking down the road alone. Defendant claimed that he and Mr. Sant "went looking for them" and when they could not locate them, they "called someone that knew them to tell him that they had left."

### Verbal Statement

On April 27, 2016, LPSO Detective Tracy Clark began investigating the disappearance of Mr. Garner and Ms. Copling. He travelled to Joshua Sant's residence in Tullos, where he spoke with Defendant, who was present when Detective Clark arrived. Detective Clark testified that Defendant advised him that, "He had last seen them leave the residence walking up Park Street towards Highway 125, the night, during the night, and they were inebriated when they left the residence." According to Detective Clark, that statement was the same as the verbal account he had received from Mr. Sant.

### First Recorded Statement

Later on April 27, 2016, Defendant gave a recorded statement to Detective Clark and Detective Brant King, after being *Mirandized*,[1] in which he initially denied knowing anything about the couple's whereabouts after they left Mr. Sant's house. Shortly thereafter, he claimed that he blacked out after going to Mr. Sant's

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966).

2

house and drinking and did not recall what occurred, but then later stated, "I think I shot the black boy." He initially denied knowing where the shooting occurred, but then later during his statement, he led law enforcement, including Detectives Clark and Richard Smith, to the location where the bodies of the victims were found. Defendant stated that he thought Mr. Garner came at him because he "tried to put the gun to his head or something?" He further stated that Mr. Garner tried to take the gun from him, so he "pulled back and [he] shot [Mr. Garner] in the head." After Defendant shot Mr. Garner once in the head, Defendant said that he shot Mr. Garner two more times to make sure he was dead. He stated that Mr. Sant then shot Ms. Copling. Shortly thereafter, Defendant stated that he also shot Ms. Copling. Defendant said that someone had mentioned to Mr. Sant that Mr. Garner was a child molester and that may have made him mad, but he did not remember asking Mr. Garner about the truth of this claim. He further admitted they took the victims out into the woods to scare them because of this, after which he claimed that things got out of hand. Defendant then admitted that he and Mr. Sant had made a pact not to tell anyone what had happened. After the victims were located, Defendant was transported back to the local jail.

### Second Recorded Statement

Beginning at approximately 11:44 p.m. on April 27, 2016, Detective Jimmy Arbogast and Detective Clark again interviewed Defendant, after advising him again of his *Miranda* rights. During this statement, Defendant admitted that he had attempted to hide information about the details of the crime during his previous statement, as reflected in the following colloquy:

[Det. Clark]: I came in contact with you at 10:20 this morning?

Austin: Yes sir.

3

[Det. Clark]:I talked to you, and you noticed my . . . I'm sure you noticed my interest in the purse being in the truck.

Austin:    Yes sir.

[Det. Clark]:Did Josh Sant give you a story to tell me, or law enforcement, about the purse?

Austin:    No sir, he didn't give me his story, so I had to make it up on the spot.

[Det. Clark]:Ok. He told you that?

Austin:    And . . . yes.

[Det. Clark]:You have to make up the story about the purse?

Austin:    Yes sir.

During this interview, Defendant stated that he was outside at his home on April 24, 2016, when he heard music from Mr. Sant's house, so he went over and played beer pong with Mr. Sant and the victims. Defendant told the detectives that after a couple games of beer pong, Mr. Sant took him aside and told him that the victims were child molesters and that they should run them out of town. He stated that Mr. Sant went inside, got dressed, and grabbed a second gun, as he was already carrying one, and that he (Mr. Sant) then convinced Mr. Garner that they should go shoot the guns a couple times for target practice before he took them back to the house where they were staying. He described the gun as "Brown, with a blackish kind of barrel on it. Brown handle, black barrel." Defendant stated that during the second of the three beer pong games they played, two people stopped briefly by the house to get a key from Katelynn Parsley, Mr. Sant's fiancé, and afterwards she stayed inside the house watching television while they left with the victims.

Defendant stated that after taking the victims to a remote location outside of Tullos, along the banks of a small body of water, he and Mr. Sant knelt down and

spoke, then got up facing the couple with the guns, at which point Mr. Garner tried to take his gun from him. He stated that he shot Mr. Garner with a .22 caliber pistol, Mr. Sant shot Ms. Copling with a larger caliber pistol, then Defendant shot Mr. Garner twice more because he thought that he was still breathing. Defendant stated that his first shot to Mr. Garner was in the head and the other two were "in what [Defendant] would suppose to be is [sic] the head." He stated that he dragged Mr. Garner's body into the water by his wrist and then gave the .22 back to Mr. Sant while they were walking back to the truck.

Defendant told the detectives that the last time he saw the guns was when Mr. Sant placed them under the center console of his truck. He claimed that once they arrived back at Mr. Sant's house, he stayed there smoking while Mr. Sant went down the road and obtained some pills, two of which Defendant took. Defendant stated that Mr. Sant then called Thomas Aubry, the owner of the house where the victims had been staying, and reported that Mr. Garner and Ms. Copling simply walked off, presumably got lost, and that they did not know of their whereabouts or what happened to them. He further asked that Mr. Aubry come get Ms. Copling's purse, which she had left at his house. This was the same story that Defendant and Mr. Sant gave in their initial written reports. Defendant admitted that Mr. Sant told him what to say to law enforcement before he gave his written statement on April 26, 2016. He described the agreement between the two as a "blood pact."

### Third Recorded Statement

During their booking on the murder and conspiracy charges on April 29, 2016, both Defendant and Mr. Sant spoke to the detectives. The entire process was recorded, with both Defendant and Mr. Sant present at varying times during the recording after they were *Mirandized*. When informed that Mr. Sant admitted that

5

he and Defendant threw the guns into the pond after killing the victims, Defendant stated that they took the guns to a man after the shooting, who gave Mr. Sant four pills, two of which Defendant consumed. He also provided the location of the house where they delivered the guns. Defendant was then removed from the room, and Mr. Sant was brought in to speak with the detectives. After being confronted with the knowledge that the guns were not in the pond, Mr. Sant told the detectives that he had given the guns to his father. Mr. Sant then called his parents, and Detective Clark arranged to meet his father to retrieve the murder weapons. Although Detective Clark recovered the .22 caliber pistol, no firearms testing was done on the weapon nor any of the shell casings recovered from the murder scene.

On May 20, 2016, Defendant gave another statement to Detective Clark; however, no transcript or video of that statement was entered into evidence at trial after an objection was lodged by counsel for Defendant. Detective Clark did testify that this interview, taken at Defendant's bequest, offered no new information.

Detective Clark testified during the trial that Defendant admitted to him that he used a .22 caliber handgun to kill Mr. Garner. Detective Smith testified that he recovered two .22 caliber shell casings at the scene of the murder, which he secured as evidence. The recovered casings were introduced into evidence at trial. Dr. Christopher Tape, a forensic pathologist employed by the Louisiana Forensic Center in Lafayette, testified that he performed an autopsy on Mr. Garner, and he identified three gunshot wounds to the head as the cause of death.

Defendant now appeals his convictions, raising as his sole assignment of error that the trial court erred in allowing into evidence the recorded statement made to law enforcement by Defendant's co-conspirator, Mr. Sant, which was contained within the third recorded statement summarized above. Defendant

6

argues that the statement was hearsay and should not have been played to the jury in the absence of testimony from Mr. Sant.

## OPINION

### *Errors Patent*

Pursuant to La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of the record. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La.Code Crim.P. art. 920(2). After review, we find no such errors.

### *Hearsay Evidence*

In Defendant's sole assignment of error, he contends that the trial court erred in playing and admitting into evidence that portion of the recording from the April 29, 2016 booking process, where Mr. Sant admitted that he gave the murder weapons to his father and then contacted his parents to turn in the weapons to the detectives. Defendant's counsel lodged the following objection at trial:

| | |
|---|---|
| Mr. Lemke: | . . . I'm going to object to Joshua's portion of the booking. He's not a witness here and he's not on the stand. So basically it's hearsay. And I'll have no opportunity to cross-examine Josh. I believe the introduction of this statement is prejudicial to my client. |
| [The Prosecutor]: | Hearsay statement of a co-conspirator clearly establishes a prima facie case of a conspiracy. |
| The Court: | Okay. |
| Mr. Lemke: | I would just note that these are statements after the conspiracy has ended. |

The objection was overruled.

7

Pursuant to La.Code Evid. art. 801(D)(3)(b), a statement is not hearsay if it is made "by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established." Defendant's sole argument is that because he had already confessed to killing Mr. Garner and both he and Mr. Sant had already been arrested, the conspiracy no longer existed; and therefore, the co-conspirator exception to the hearsay rule was inapplicable. Defendant requests that his convictions be reversed, his sentence vacated, and the case remanded to the trial court.

The law pertaining to the admissibility or exclusion of co-conspirator statements and our appellate review thereof is well established:

> After the state presents a prima facie case of conspiracy, the burden of proof shifts to the defendant to present evidence showing his withdrawal from the conspiracy prior to the time the statements were made by his co-conspirators. The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or the termination of the conspiracy. *United States v. Walker*, 796 F.2d 43, 49 (4th Cir.1986). To prove withdrawal, a defendant must show affirmative actions made by him that are inconsistent with the object of the conspiracy. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Such affirmative actions include making a clean break through confession to the authorities as well as notification to the co-conspirators of abandonment or withdrawal. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).
>
> The standard for determining the admissibility of statements made by co-conspirators is less than that required to convict a defendant of conspiracy to commit an offense. A trial court's determination as to the admissibility of such evidence, i.e., whether the state has made a prima facie showing of a conspiracy and whether a defendant has sufficiently proven withdrawal so as to make his co-conspirators' statements admissible or inadmissible under LSA-C.E. Art. 801D(3)(b), will not be overturned absent clear error. See *United States v. Taylor*, 802 F.2d 1108 (9th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987); *State v. Lobato*, 603 So.2d 739 (La.1992).

*State v. Woodard*, 03-636, pp. 3-4 (La.App. 4 Cir. 4/30/03), 847 So.2d 629, 632.

8

Defendant admits that "the state presented a prima facie case of conspiracy." However, he argues that because he confessed to murdering Mr. Garner on April 27, 2016, the conspiracy had ended, and Mr. Sant's statements were inadmissible hearsay. The state contends otherwise:

> The State submits that due to the fact that the defendant had not completely told the truth to the detectives working to solve this murder that he had not "come totally clean and was not totally abreast" about his involvement and therefore had not clearly withdrawn from the conspiracy. Therefore the admission of the statement of the co-conspirator Joshua Sant was not error and was not inadmissible hearsay.

As noted in *Woodard*, the state's presentation of a prima facie case of conspiracy shifts the burden to Defendant to prove termination of the conspiracy in order for Mr. Sant's statement to be considered hearsay. Furthermore, this court should not overturn the trial court's ruling that the statement was admissible "absent clear error." *Id.* at 632. We find no such error here. When Defendant's trial counsel objected to the introduction of the statement, he provided the trial court with no argument as to why the conspiracy was ended; he merely made the conclusory statement, "I would just note that these are statements after the conspiracy has ended." As noted in *Woodard*, Defendant must rebut the presumption that the conspiracy was ongoing when Mr. Sant gave his statement. As pointed out by the state in its appellate brief, Defendant's story was still evolving and changing when Mr. Sant's statement was made.

Detective Clark testified that Defendant never completely "came clean" about what had happened and throughout the investigation only gave "bits and pieces" about the events. In fact, as late as the April 29, 2016 statement, Defendant told Detective Clark that the guns were delivered to some anonymous person, when they had actually been delivered to Mr. Sant's father, as Mr. Sant's statement revealed shortly thereafter. It is apparent that Defendant was still

9

engaged, up to this point, in hiding certain details about the crime as per he and Mr. Sant's original "blood pact." Given Defendant's actions up to the point of Mr. Sant's statement and his trial counsel's failure to enunciate an explanation as to why the conspiracy had ended before the statement was made, the trial court did not clearly err in finding that the statements were made during an ongoing conspiracy and were, therefore, admissible.

Louisiana courts have also found that the admission of hearsay is subject to a harmless error analysis. In *State v. Tucker*, 49,822, 49,950, p. 22 (La.App. 2 Cir. 7/8/15), 170 So.3d 394, 412, the second circuit addressed a claim involving a co-conspirator's statement in a conspiracy to commit jury tampering, as follows:

> We also conclude that even if the contested communications with Hall were inadmissible hearsay, reversal of the convictions for jury tampering is not warranted because the error was harmless beyond a reasonable doubt. This evidence of these communications was merely cumulative of other (and much more damaging) evidence of the conspiracy to commit jury tampering, e.g., the transcript and recording of the March 17 telephone conversations and Griffin's testimony.

Similarly, we find that even if the statements complained of were inadmissible hearsay, the error occasioned by their admission was harmless beyond a reasonable doubt. Mr. Sant's statement was cumulative evidence considering that Defendant told detectives that Mr. Sant had given the guns to someone on the way back from the murder. He even gave them directions to a location near the home of Mr. Sant's father, where the drop-off allegedly occurred, immediately before Mr. Sant admitted that he gave the guns to his father and called his parents to have them bring the weapons to Detective Clark. Indeed, Mr. Sant's statement, in and of itself, does not even mention Defendant or anything concerning his involvement in the crimes. It merely details Detective Clark and Mr. Sant contacting Mr. Sant's parents by phone to arrange for the delivery of the weapons

10

to Detective Clark. While this was a small piece of the overall evidence, it was certainly not a crucial element.

Defendant himself gave multiple statements in which he admitted to killing the victim. He admitted to shooting the victim three times, as corroborated by the testimony of Dr. Tate; and he admitted using a .22 caliber pistol, matching the evidence of the two shell casings found by Detective Smith and introduced at trial. While the recovered weapon, as a partial result of Mr. Sant's statement, was introduced as evidence without objection, it too was only cumulative of the otherwise substantial evidence of Defendant's guilt. Although the introduction of the weapon into evidence had corroborative value, as Detective Cark testified that the actual gun matched the earlier description given by Defendant, it alone was not direct evidence in that no firearms analysis was performed on the weapon, which may have given more weight to the item as the actual murder weapon. Finally, Defendant's multiple statements, which were presented to the jury, contained discussions of the pact made by Defendant and Mr. Sant before their first interaction with law enforcement, to never discuss the murders with anyone, as well as discussions about how the two of them came up with the false story that the two victims just walked down the road and disappeared. Even in the absence of Mr. Sant's statement as to the actual location of the guns, there was ample evidence to support Defendant's convictions.

Accordingly, we conclude that there was no error in the introduction of Mr. Sant's statement, and even assuming arguendo that such should not have been considered, the same was harmless error beyond a reasonable doubt.

## DISPOSITION

For the foregoing reasons, the convictions and sentences of Defendant, Austin W. Dyess, are affirmed.

**AFFIRMED.**